James LAWING, et al., Respondent,

v.

INTERSTATE BUDGET MOTEL, INC., Appellant.

No. 46276.

Missouri Court of Appeals, Eastern District, Division Five.

July 12, 1983.

ates, and against Interstate Budget Motel, Inc. rendered on a petition for damages for breach of an oral agreement to pay Lawing a $10,000 fee as profit and wages for supervising construction of a motel in Wentzville, and from the judgment against Interstate on its counterclaim against Lawing for defects in construction.

## I. *On the Petition*

It is uncontroverted that Robert Bross, President of Interstate, and James Lawing entered into an oral contract for Lawing to serve as contractor, supervisor or project manager in constructing the motel. The work commenced in May, 1978 and was finally completed in November, 1979.

In this court-tried case it is our duty to determine whether the finding and judgment for Lawing, based upon the existence of an express oral contract by Bross to pay Lawing $10,000 for supervising and coordinating the project, is supported by substantial evidence under the scope of review prescribed in *Murphy v. Carron,* 536 S.W.2d 30 (Mo. banc 1976).

In his pre-trial deposition Lawing stated that prior to the beginning of the project there was an agreement to pay him a $10,-000 supervision fee but at trial, in direct contradiction to his deposition, Lawing nullified this testimony by testifying that the $10,000 figure "was not agreed to" at the time the project was begun. Lawing's trial testimony was simply that after construction commenced Lawing mentioned a $10,-000 supervision fee to Bross; that Bross did not "say anything against it;" "did not deny it;" and "did not say anything." Furthermore, at trial Lawing testified the parties were on a cost-plus basis; that all of the bills submitted to Interstate for labor "included the ten percent profit and ten percent overhead;" that Lawing was hoping to have a profit percentage built into his numbers; that he was "hoping to make it on the profit that was being charged and all the labor that was done on that job."

The surrounding circumstances do not support the existence of an agreement to pay the $10,000 fee. An item of $10,000 for

Niedner, Moerschel, Ahlheim & Bodeux by Edward C. Ahlheim, St. Charles, for appellant.

Ronald L. Boggs, St. Charles, for respondent.

HOUSER, Senior Judge.

Appeal from a judgment in favor of James Lawing, d/b/a Jim Lawing Associ-

supervision does not appear in the documentation. Three written estimates listing the various project costs were prepared and submitted to Crossroads Economic Development Corporation of St. Charles County in support of Interstate's effort to obtain financing for the motel. The first cost estimate, dated July 1, 1977, under the heading "Jim Lawing and Associates," signed by Lawing, listed thirty one separate items totaling $1,000,000, but it did not contain a $10,000 item for supervision. A second cost estimate totaling $1,154,000 made no reference to a supervision cost. After construction commenced costs ran considerably higher than the estimates. To obtain additional financing a third and final cost estimate was prepared by Bross. Dated May, 1979, it contained thirty one items totaling $1,554,000, but it did not contain a $10,000 item for supervision. The only writing in evidence referring to such a fee is an unsigned sheet of yellow paper headed "I.B.M. Estimate 7/12/78," partly in Lawing's handwriting and partly in the handwriting of his wife Shirley, who was Lawing's bookkeeper. One of the twenty nine items listed was "Supervision $10,000." This was written in by Shirley at the direction of Lawing. This paper was prepared several months *after* the project was begun. There is no evidence that Bross or any other officer or agent of Interstate approved this paper or used it in preparing a cost estimate in support of an application for financing, or that it was ever submitted to Crossroads.

Bross testified that he never had a discussion with Lawing regarding a $10,000 supervision fee. The first he became aware of a $10,000 fee was when it was brought to his attention on the yellow sheet dated 7/12/78. He ignored it—never really considered it—thought nothing of it—because Bross had "never worked with Jim that way." Bross testified that the reason Lawing showed that figure on the July, 1978 paper was to raise the overall cost in justification of a request for a larger loan; that the list prepared by Lawing contained other items that could not be justified, which were included by Lawing to "jim up" the cost estimate. Lawing admitted that he

prepared this paper because Bross needed "revised numbers" to substantiate additional loans.

Shirley Lawing, who as bookkeeper personally prepared the papers in connection with this project, and who for ten years had familiarized herself with the business, thus described their modus operandi: Lawing would pay for materials furnished and wages earned by laborers. Periodically Shirley would bill Interstate for the amounts advanced for labor and materials. Interstate would then reimburse Lawing. To the amounts Lawing reported having paid laborers and employees on an hourly basis Lawing would have Shirley add ten percent for profit and ten percent for insurance, tools and overhead. Nothing was added for amounts paid to material men and sub-contractors. Shirley testified that Lawing normally made his profit for performing construction work in this manner, *i.e.*, "by putting the profit in on top of the wage rates that (Lawing) paid (his) employees." It was a cost-plus arrangement. Lawing's testimony confirms that they were operating on a cost-plus basis. In addition to the profit thus factored into the wages, Lawing was compensated for doing physical labor as a carpenter on the job for a total of 325 hours, for which he was paid the union rate paid other carpenters ($16.50 to $18.00 per hour), plus the profit percentage. Lawing also did the footings and foundation work for the motel, at a contract price of $64,000.

The previous history of the relationship between the parties detracts from Lawing's theory of a contract. In all of their previous dealings, according to Lawing, they had operated on a cost-plus basis. Lawing had built two buildings for Bross; had done repair work for him on another motel, and on a filling station; had installed the foundations on the trailer sales lot. Previously they had followed the same type of billing procedure employed on the Interstate motel, namely, "Time and cost. Time and material." To Shirley's knowledge no specific additional supervision fees were charged in any of their past dealings. The

$10,000 charge in the instant case was the first deviation from the normal, standard method of dealing.

■ It was Lawing's burden to show that a proposal made by Lawing was accepted by Bross as made, *Crossley v. Summit Lumber Co.,* 187 S.W. 113 (Mo.App. 1916), and to make that proof by a preponderance of the evidence. There is no substantial evidence, much less a preponderance of the evidence, that Bross accepted a proposal by Lawing that Interstate pay the fee in question. Lawing's deposition testimony affirming the existence of such a contract was destroyed by his trial testimony to the contrary. His testimony that he broached the subject to Bross who remained mute is insufficient to show a meeting of the minds. "It is an old maxim that silence gives consent; but this is not a rule of law. It is certain that, if the only facts are that A makes an offer to B and B remains silent, there is no contract." 1 Corbin on Contracts § 72 (1963). "The minds of the contracting parties must meet upon and assent to the same thing in the same sense and at the same time." *Macy v. Day* (Mo.App. 1961) 346 S.W.2d 555. If Lawing made Bross an offer (which Bross denies) there had to be an acceptance by Bross to perfect a contract, but according to Lawing's own account Bross neither accepted nor rejected the offer—did nothing which could be construed as an acceptance. Bross, who remained mute, was under no obligation to speak. Previous dealings between the parties gave Lawing no reason to believe that silence was intended by Bross to signify a manifestation of assent. Under these circumstances silence cannot be transformed into acceptance. Lawing's self-serving yellow paper has little if any weight in the tally. Interstate did not accept, adopt or acquiesce in the listing of the fee in this paper. The omission of the item from the three cost estimates that were submitted to Crossroads, however, is significant. That Lawing was paid in this case, as in all previous dealings, on a cost-plus basis tends to refute his claim. Finally, Bross denied ever having discussed the subject with Lawing.

■ It is our conclusion that the judgment, based upon the existence of an oral contract to pay Lawing a $10,000 supervision fee, is not supported by substantial evidence.

## II. *On the Counterclaim*

Interstate's counterclaim prayed for $200,000 damages for failure to perform the contract for the erection of the motel, and negligent performance in an unworkmanlike manner. Interstate alleged nineteen respects in which it claimed Lawing failed to perform. Interstate introduced the testimony of John Hickel, a structural engineer, Ralph Prinster, a real estate appraiser, and Bob Bross, President of Interstate.

The structural engineer testified as follows: On inspection of the motel in May, 1982 he found the general workmanship to be poor. He found absence of flashing where needed; improper application of flashing; water having entered the building; improper nailing of shingles; delaminating of roof plywood; insufficient caulking; improper pouring of concrete; improper grading requiring a concrete step at the office entrance, creating a safety hazard; improper application of the tile roof. The plans and drawings provided for a 36-inch crawl space or tunnel under the motel, for access to plumbing, wiring, electrical systems and pipes. The engineer (as well as the appraiser) found the depth to be 18 to 20 inches, which "seriously impairs the use of the service tunnel area." This defect could be cured but only with great difficulty. To remedy the situation would require excavation by hand, which is possible but expensive. The roof does not have a good slope. Water stands in many places on the roof. The brick over the 100 windows in the motel is supported by 1-inch cedar lintels. They are sagging. Cracks are developing in the corners of the brick installation. Normally steel angles are used as lintels to support brick. To cure this defect would require removal of the brick, installation of steel lintels and replacement of the brick. The mansard roof is not well con-

nected or structurally attached to the substructure. There are gaps under the doors.

The real estate appraiser inspected the motel. He corroborated the testimony of the engineer with reference to the crawl space, wooden lintels, improper application of the roof, causing leakage with severe water stains, lack of flashing, improper nailing of roof, and he also criticized the use of cinder block veneer because it is porous and absorbs moisture. He estimated depreciation or loss of value of $110,675 caused by deterioration and economic and functional obsolescence.

Bross confirmed the testimony of these witnesses. He said it is very difficult to get workers to go into the tunnel area to work. They have to wear wet suits, go in twos, have communication with each other, and carry lights. One laborer working in the crawl space got claustrophobia. Bross complained that the concrete floor in the laundry room, supposed to be 12 inches thick, was poured only 8 inches thick, resulting in excessive vibration of the machinery, endangering electrical circuits and wiring, and causing vibration in adjoining rooms; that the facia boards were improperly nailed and have blown off many times; that the drawings called for swales in the sidewalk to accommodate handicapped people and service personnel but that the concrete was poured without swales, and that in other respects the motel was not built according to the plans.

Lawing's testimony refuted the charge that the crawl space was not built according to the drawings; accounted for the 8-inch slab on the basis that it was the product of a joint decision by Lawing, the concrete man, Mr. VanGennip (one of the four shareholders in the Interstate) and that Bross "was aware of what (they) were doing". Lawing testified that the original drawings showed 2 × 10 or 2 × 12 cedar lintels but that when the units arrived from the factory they were 1 × 10 or 1 × 12; that Lawing questioned Bross about the 1-inch lintels and Bross told him that 2-inch "cost too

much"; that Lawing and Bross discussed it with the bricklayer, who said that by bracing there would be no problem and "it was decided to do it this way." Lawing denied there was any sagging, and denied there had been any discussion about Lawing pretesting the 1 × 12 lintels to see if they would hold, before actually starting the brickwork.

Interstate failed to properly prove damages. In the case of substantial but defective performance by a contractor the measure of damages recoverable by the owner is determined by either or both[1] of two different rules, depending upon the facts and circumstances of the particular case. The two rules are the cost rule and the diminished value rule. The cost rule is the cost of repairing the defects to make the building or structure conform to the plans and specifications. The diminished value rule is the difference between the value of the property with the defective work and what its value would have been if it had been constructed according to the terms of the contract. As a general rule the measure of damages to be applied is the cost of correcting the defects or supplying the omissions. *Staab v. Thoreson,* 579 S.W.2d 414, 420 (Mo.App.1979); *Forsythe v. Starnes,* 554 S.W.2d 100, 109 (Mo.App.1977); *Edmonds v. Stratton,* 457 S.W.2d 228, 233[10] (Mo.App.1970); *Brusca v. Gallup,* 429 S.W.2d 780, 783[6] (Mo.App.1968); 13 Am.Jur.2d Building and Construction Contracts § 79; 25 C.J.S. Damages § 76. Interstate introduced no evidence in support of the cost rule in connection with any of the items of complaint. The only evidence Interstate gave the trial court by which to measure the damages was the testimony of the real estate appraiser who, using a variation of the diminished value rule, estimated the damages at $110,675. He did not estimate the diminished value as the result of any individual defect. The $110,675 estimate was an all-conclusive, lump-sum figure representing the diminished value re-

---

1. Where there are a number of defects, the value rule may be applied to some and the cost rule to others, * * *. *Gerodetti v. Broadacres, Inc.,* 363 So.2d 265, 268[5] (Miss.1978).

sulting from the sum total of all the defects he observed.

 The diminished value rule is appropriate where the cost of reconstruction and completion in accordance with the contract would involve unreasonable economic waste, *Forsythe v. Starnes, supra,* 554 S.W.2d l.c. 109. The only evidence remotely related to the diminished value rule is the engineer's testimony that to remedy the crawl space to give adequate space in the tunnel area would require excavation by hand, which could be done with great difficulty but would be expensive. This is not sufficient proof of economic waste to invoke the diminished value rule as to the crawl space. No effort was made to apply the diminished value rule to any of the other alleged defects by showing that they could not be remedied without unreasonable economic waste. Nor, as indicated, did Interstate prove damages under the cost rule by showing the cost of repairing the defects or completing the omissions. Consequently Interstate did not give the trial court any basis for finding any amount of damages with respect to any particular item of complaint. In brief, there was a total failure of proof of damages in dollars and cents.

The trial court, sitting without a jury, found the issues on the counterclaim for Lawing and against Interstate. No findings of fact or conclusions of law were requested or made. The trial court reasonably could have reached this result on the basis of total failure on the part of Interstate to prove its damages, and for this reason we are obliged to affirm the judgment of the trial court on the counterclaim.

### Conclusion

The trial court rendered judgment for Lawing on Count I for $18,000. Appellant Interstate concedes that $8,000 of this sum, representing cost of materials admittedly furnished, was proper. On Count I, therefore, the judgment is reversed and the cause remanded with directions to set aside the judgment for $18,000 and enter a new judgment as of July 30, 1982 for plaintiff Lawing and against defendant Interstate in the sum of $8,000.

The judgment on Count II (on the counterclaim) for Lawing and against Interstate is affirmed.

SATZ, P.J., and ARTHUR LITZ, Special Judge, concur.