Charles ANDERSON, Appellant,

v.

GRIFFIN, DYSART, TAYLOR, PENNER & LAY, P.C., Ivan Merrick, Jack G. Beamer, Lee E. Wells and Stanley D. Slagg, David Dysart, Respondents.

No. WD 35251.

Missouri Court of Appeals, Western District.

Sept. 25, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 27, 1984.

Application to Transfer Denied Feb. 26, 1985.

Richard H. Anton, Kansas City, for appellant.

Paul H. Niewald, Niewald, Waldeck, Norris & Brown, Kansas City, for respondent Griffin, Dysart, Taylor, Penner & Lay, P.C.

Kenneth O. Smith, Sharon K. Weedin, Knipmeyer, McCann, Fish & Smith, Kansas City, for respondent Ivan Merrick, Jack G. Beamer, Lee E. Wells and Stanley D. Slagg.

Before CLARK, P.J., and DIXON and LOWENSTEIN, JJ.

LOWENSTEIN, Judge.

Plaintiff-appellant, Anderson, appeals from a trial court order dismissing his petition on the ground that his action is barred by the statute of limitations. The scope of review on a motion to dismiss requires that the court examines the pleadings allowing them their broadest intendment, treating all facts alleged as true and construing the allegations favorably to the plaintiff. *Best v. Schoemehl,* 652 S.W.2d 740 (Mo.App.1983).

Anderson retained respondent Dysart in 1974 as his attorney to pursue a claim against Vincent Pisciotta for personal injuries resulting from a bar room battery. At

this time Dysart was with the respondent firm of Griffin, Dysart, Taylor, Penner & Lay, P.C. The following is a chronological list of events that led up to this appeal.

| | |
|---|---|
| December 19, 1974 | Dysart files petition for damages for client Anderson. |
| January 17, 1975 | Pisciotta files his answer and counterclaim for alleged malicious prosecution. |
| January 21, 1975 | Dysart files reply to counterclaim. |
| February 14, 1975 | Dysart mails answers to first set of interrogatories. |
| March 4, 1975 | Pisciotta files second set of interrogatories. |
| Spring, 1975 | Anderson requests Dysart to dismiss the petition. |
| May 1, 1975 | Pisciotta files motion to compel discovery (sent to Dysart). |
| July, 1975 | Dysart moves to respondent law firm of Merrick, Beamer, Wells & Slagg. |
| July 2, 1975 | Court order compelling discovery within 15 days (sent to Dysart). |
| July 25, 1975 | Pisciotta files motion to strike Anderson's pleadings for failure to make discovery (copy mailed to Dysart's new address). |
| September 5, 1975 | Court order striking Anderson's pleadings (sent to Dysart). |
| September 10, 1975 | First notice of default judgment hearing (sent to Dysart). |
| October 21, 1975 | Second notice of default judgment hearing (sent to Dysart). |
| October 30, 1975 | Default judgment for $4,075.00 entered on the counterclaim against Anderson (copy sent to Dysart). |
| October 1981 | Anderson has wages garnished and first becomes aware of default judgment. |
| April 20, 1983 | Anderson files petition for legal malpractice and fraud against Dysart and the two respondent law firms. |

The outcome of this appeal hinges on the application of § 516.100 RSMo 1978 which defines when the five year statute of limitations of § 516.120 begins to run. The pertinent language is as follows:

. [T]he cause of action shall not be deemed to accrue when the wrong is done or the technical breach of contract or duty occurs, but when the damage resulting therefrom is *sustained and capable of ascertainment* ... (emphasis added).

The trial court determined that the statute began to run on October 30, 1975, the date the default judgment was entered. This placed Anderson's present petition well beyond the five year statute of limitations. Anderson contends, and this court agrees, that the statute did not begin to run until October of 1981 when Anderson's wages were garnished. Thus the 1983 petition was not barred by the statute of limitations and should not have been dismissed.

Missouri courts have often quoted the "capable of ascertainment" language of § 516.100 since its adoption in 1919. It purports to be a middle-of-the-road test in determining the commencement of a statute of limitations, but it has never been precisely defined by the courts. The most restrictive test is the "occurrence rule" or "wrongful act" test which says that the moment the defendant commits the malpractice the statute is triggered. Missouri has rejected this test by statute. The most broad test is the "discovery" rule which looks to the moment the plaintiff first becomes aware he has been aggrieved. This test was rejected by the Missouri Supreme Court in *Jepson v. Stubbs,* 555 S.W.2d 307 (Mo. banc 1977). In *Jepson,* an attorney incorrectly advised his client that he had no defense to federal charges based on the client's refusal to submit to induction into military service. The court said that the time the client was sentenced to prison was not the date on which the damages were capable of ascertainment but rather damages were ascertainable when he was placed on parole.

■ In *Janssen v. Guaranty Land Title Co.,* 571 S.W.2d 702, 705 (Mo.App.1978), the court said the test is to "ascertain the time when plaintiff could have first maintained the action to a successful suit." In *Lato v. Concord Homes, Inc.,* 659 S.W.2d 593, 595 (Mo.App.1983), the court said the

statute of limitations "begins to run when the plaintiff's right to sue arises." Many states follow a "reasonable person" interpretation which makes whether something is ascertainable a question for the jury. In Missouri however, this is an objective test decided as a matter of law by the judge. In *Chemical Workers Basic Union v. Arnold Savings Bank*, 411 S.W.2d 159 (Mo. banc 1966), the Missouri Supreme Court said that "mere ignorance of the plaintiff of his cause of action will not prevent the running of the statute." *Id.* at 165. This principle remains true *except* when that ignorance is *totally* caused by the actions or non-action of an attorney upon whom the client is relying. While it is true Anderson could have first maintained a suit on the date the default judgment was entered, that presupposes his ability to be omniscient.

Two cases on which the respondents rely and which must be distinguished are *Fischer v. Browne*, 586 S.W.2d 733 (Mo. App.1979), and *Kueneke v. Jeggle*, 658 S.W.2d 516 (Mo.App.1983). Both of these legal malpractice cases hold that the damages were capable of ascertainment at the time the original judgment was entered. In *Fischer* the malpractice concerned failure to pursue the plaintiff's administrative remedies before filing suit; in *Kueneke* it concerned the failure to notify the plaintiff of the need to raise and plead a compulsory counterclaim arising out of a car accident. In both of these cases the clients were actually involved in the original suit; in *Fischer* the plaintiff/client had been personally served with the motion for summary judgment. In the present case Anderson was totally unaware that the law suit was still in progress; he believed the case was dismissed and over with. More importantly the *Fischer* and *Kueneke* cases involved *misfeasance;* there the attorneys gave bad advice as to how to proceed with the case. The present case involves *nonfeasance*. Attorney Dysart was told by his client to dismiss the case, yet he did not. Dysart was supposedly dismissed as Anderson's attorney, yet he never formally withdrew from the case. As far as the court and the other party knew, Dysart was still the attorney for Anderson and so they sent him every notice, yet Dysart never passed these notices to Anderson, thereby concealing the fact that a live suit against him was still pending.

The respondents contend that because the default judgment was a matter of public record that damages were capable of ascertainment on October 30, 1975. While that is literally true, the facts in this case mitigate against strict adhearance to the "capable of ascertainment interpretations in *Fischer, supra,* and *Kuenke, supra*. As a layman, Anderson cannot be expected to double check every act (or failure to act) of his attorney. While it is clear that Anderson could not collaterally attack the default judgment, and is held to the constructive knowledge of anything his attorney knew, it does not follow that Anderson constructively knew, *vis-a-vis* the time to bring suit, those same facts with regards to a malpractice suit against the very attorney who concealed those facts from him. On seven occasions after Anderson's directions to dismiss the case, Dysart received papers from either the court or the defendant Pisciotta. Even assuming Dysart believed Anderson had dismissed him as his attorney, Missouri Supreme Court Rule 4 DR 2–110 and EC 9–2 required action on Dysart's part. DR 2–110(A)(2) says:

> In any event, a lawyer shall not withdraw from employment until he has taken reasonable steps to avoid foreseeable prejudice to the rights of his client, allowing time for employment of other counsel, *delivering to the client all papers* and property to which the client is entitled, and complying with applicable laws and rules. (Emphasis added.)

EC 9–2 goes on to say in part:

> In order to avoid misunderstandings and hence to maintain confidence, a lawyer should *fully and promptly inform his client of material developments* in the matters handled for the client. (Emphasis added.)

There is case law in Missouri that supports a different interpretation of "capable of ascertainment" when there is a layman—expert relationship involved. As pointed out in *Arst v. Max Barken, Inc.*, 655 S.W.2d 845 (Mo.App.1983), in most breach of contract or breach of duty cases, the plaintiff can himself ascertain his own injuries. In *Arst* the plaintiff was attempting to sue his contractor for cracks in the foundation of his home. Arst could see the cracks in 1969 but waited until 1979 to hire someone to figure out the exact cause of the cracks, and then tried to sue. The *Arst* court said the cases cited by the appellant (including *Thorne v. Johnson, infra*) in support of a later date for accrual of the cause of action were inapplicable because they all involved plaintiffs who had employed experts, and the experts were capable of ascertaining plaintiffs' injuries, but the plaintiffs were not capable of doing it themselves.

One such case is *Krug v. Sterling Drug, Inc.*, 416 S.W.2d 143 (Mo.1967), which involved a plaintiff/consumer who used a drug manufactured by the defendant. The supreme court said:

> The rationale of the cases involving delayed manifestation of injuries caused by wrongful conduct which was unknown to the plaintiff at the time of the invasion of his rights is 'that a person must have some notice of his cause of action, an awareness that either he has suffered an injury or that another person has committed a legal wrong which ultimately may result in harm to him, before the statute can begin to run.'

As in *Krug*, there was delayed manifestation of injury to Anderson. He had no awareness that he had suffered an injury, *i.e.*, a default judgment entered against him, until his wages were garnished. Another case which exemplifies this special layman/expert relationship is *Thorne v. Johnson*, 483 S.W.2d 658 (Mo.App.1972). There an abstract company was hired in 1957, and its mistake in searching the record was not discovered by plaintiff until 1968. The court held it was not until 1968 that the statute began to run saying:

> It is true that the whole world, including appellants, are bound to constructive knowledge of documents which have been duly recorded. That of course is the very reason why abstract companies are in business ... It would be absurd to lay down as a legal requirement that these parties, in addition to hiring a professional abstractor, should also have to make their own independant laymen's investigation to ascertain whether their professional agent had done its job properly. *Id.* at 663.

Respondents argue that *Thorne*'s logic should only apply to abstractors and not to attorneys. Actually the *Thorne* rationale is even more compelling in an attorney/client relationship where more important matters than the chain of title to property can be entrusted to the expert. Likewise here it would be absurd to require a client, in addition to hiring an attorney, to make a layman's investigation to determine whether the attorney had done his job properly or was forwarding important papers and orders to him.

The respondents argue that statutes of limitations are to be strictly construed so as to avoid stale claims. They pose the problem of the default judgment having not been executed through garnishment until the tenth year, or worse yet the judgment having been revived to run for a total of twenty years after the original order. The *Thorne* court had no difficulty with an eleven year delay and there the abstractor had no way of rectifying the situation any earlier than the client's discovery. In the present case the attorney Dysart in a sense had the keys to the courthouse door. *He* knew of the potential of and actual happening of default judgment all along and at any point during those six years could have informed his client. Clearly the client Anderson was shocked when he had his wages garnished six years after he thought the case had been dismissed. Anderson would have been even more shocked had the garnishment been postponed ten or twenty

years. As to the judgment creditor he would have had no alternative but to pay. To then let his attorney hide behind a strict interpretation of the statute of limitations would not promote justice and would leave the client with no relief.

 An example of how this delay in the running of the statute can be avoided is seen in *Dixon v. Shafton*, 649 S.W.2d 435 (Mo. banc 1983). There an attorney failed to read a final version of a contract before recommending it to his clients. A year and a half later when the attorney made the discovery, he immediately disclosed this information to his clients and upon his advise they retained independent counsel. Two years later the clients were sued, and three years after that the clients sued the original attorney for malpractice. Our supreme court held the clients were barred by the statute of limitations because it had begun to run no later than the date they were told of the mistake and knew a substantial claim against them existed and were told to hire another attorney. *Id.* at 438. In the present case had Dysart informed Anderson of the pending counterclaim then the statute would have begun to run as it did in *Dixon*. The problem of a stale claim was the respondents' own fault and they cannot now be heard to complain. The passage of time here worked more to reinforce the client's pleaded belief the case was done with, that he had no need for an attorney nor a necessity to check court files.

Having reached the decision that the statute of limitations did not bar Anderson's cause of action, this court need not decide whether Anderson has successfully pleaded a count in fraud because the trial court did not base the dismissal on that point. There appears to be some confusion in this case as between fraud as a legal cause of action as proposed in Count II, and the fraud under § 516.280 which tolls the running of the statute of limitations in any type of suit. This distinction is superfluous in light of the trial court's conclusion that even if a claim in "fraud" were stated, the statute of limitations would have run. The trial court judgment favor-

able to the respondents was on the underlying theory the statute of limitations had run as to fraud or negligence. This dispenses with the need here to decide whether Anderson's first amended petition as compared to his original petition states a separate cause of action for fraud. This opinion in no way reaches the merits of whether any of the respondents are guilty of malpractice or fraud. This decision is based only on the limitations issue which supported the motion to dismiss.

The judgment of the trial court as to the statute of limitations question is reversed and the cause remanded with directions to allow Anderson to file an amended petition.

All concur.