**KILLIAN CONSTRUCTION COMPANY, Respondent,**

v.

**TRI–CITY CONSTRUCTION COMPANY, Appellant.**

**No. WD 35032.**

Missouri Court of Appeals, Western District.

May 14, 1985.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied July 2, 1985.

Application to Transfer Denied Aug. 7, 1985.

Richard D. Rhyne, Kansas City, for appellant.

Donald R. Duncan, Turner, Reid, Duncan, Loomer & Patton, P.C., Springfield, for respondent.

Before PRITCHARD, P.J., and SHANGLER and BERREY, JJ.

SHANGLER, Judge.

The plaintiff Killian Construction Company subcontracted with the defendant Tri-City Construction Company to complete certain portions of the work Tri-City, as general construction contractor, agreed to perform for the United States Army Corps of Engineers. The suit by Killian against Tri-City pleaded four causes of action: Count I, for the balance owed under the contract; Count II, for the reasonable value of extra work done and accepted; Count III, for reimbursement for the cost of money borrowed to complete the subcontract project; Count IV, for punitive damages for the tortious breach of the subcontract. The defendant Tri-City counterclaims for breach of contract.

The court submitted Counts I, II, and III to the jury, and directed a verdict against Killian on Count IV. The jury found for plaintiff Killian on Count I [$54,000], found for defendant Tri-City on Count II, and found for plaintiff Killian on Count III [$35,000]. The jury found for the plaintiff Killian on the defendant Tri-City counterclaim. The appeal is by Tri-City from the judgments entered in favor of Killian on Counts I and III.

The construction of the Truman Dam in Henry County made necessary the relocation of roads in the vicinity, now threatened with inundation. On June 23, 1977, Tri-City Construction Company undertook the relocation project as general construction contractor for the United States Army Corps of Engineers. The weather was inclement that first year, and Tri-City did not accomplish much under the general contract. Tri-City then determined to subcontract a portion of the relocation project, and on June 7, 1978, contracted with B & K Excavation for that purpose. B & K was a partnership of the Bam Construction Company and the Killian Construction Company. On August 17, 1978, the amount of work was modified by a supplemental agreement. The work did not progress well, due in measure to the lack of skill of the subcontract project overseer, Butts [president of Bam Construction Company, a B & K partner], some laggardly preparatory performance by Tri-City, and other reasons. The partnership was terminated on December 15, 1978, and Butts assigned the subcontract interest to Killian—and Tri-City acceded. Killian then engaged one Carr, an engineer, to supervise the remainder of the relocation project. On August 2, 1979, the original subcontract was once again modified by another supplemental agreement. The amount of work to be done was again redefined, and the completion date was extended to October 14, 1979. The work was actually completed in December of 1979, and was given final approval, in quadrants, by the Corps of Engineers in April of 1980.

The subcontract between Tri-City and Killian [as does the general contract between the Army Corps of Engineers and

Tri-City[1]] defines performance in terms of unit quantity and payment in terms of unit price. Section 2 of the subcontract de-scribes the scope of the work Killian undertakes to perform:

| Description of Work | Estimated Quantity | Unit | Unit Price | Amount |
|---|---|---|---|---|
| Common Excavation | 82,015 | CY | 0.75 | $ 61,511.25 |
| Rock Excavation | 36,280 | CY | 3.00 | 108,840.00 |
| Embankment | 236,590 | CY | 0.95 | 224,760.50 |
| Aggregate Surfacing | 16,001.7 | Ton | 4.50 | 72,007.65 |
| Seeding & Mulching | 100 | Acres | 400.00 | 40,000.00 |
| | | | | $507,119.40 |

Thus, the subcontract terms render the *amount* as an estimated sum: that is, a calculation based on a projected quantity of work to be furnished at a fixed unit price. The subcontract provided for partial payment to Killian by the month during the work progress, computed on the basis of the engineer estimate of the work quantity performed, but the final payment was due according to the work units actually "completed by the subcontractor based on the engineer's completed unit quantities" and subject to the final approval and acceptance of the subcontractor work by the Corps of Engineers [Subcontract, § 3 *Payment*(a)]. The relocation project was completed by Killian in December of 1979. The subcontractor submitted the pay estimate of $27,187.39 for work done that December, but Tri-City never remitted.[2] That default [according to Killian] left him without the means to pay suppliers and other creditors. In May of 1980, Tri-City agreed to release sufficient funds to pay sixty percent of the amounts of the debts [except for the claim of International Harvester,

still in litigation, for the cost of certain leases of construction equipment]. Killian then negotiated a bank loan and paid the balances owed on the debts. The International Harvester suit was settled by payment from Tri-City [the named defendant] of $12,000. Killian was still without final payment from Tri-City at the time of suit.

The performance assumed by Killian under the subcontract was to complete a project already begun by Tri-City under the original general contract with the Corps of Engineers. A term of the subcontract [§ 25.1] recites:

Tri-City Corporation has been paid for the following quantities of work as listed below:

| | | |
|---|---|---|
| Common Excavation | 45,265 | CY |
| Rock Excavation | 0 | |
| Embankment | 38,090 | CY |
| Aggregate Surfacing | 498.3 | Tons |

[emphasis added]

The relocation project was completed by Killian in December of 1979. The Corps of Engineers then computed the earthwork by survey, and verified the quantities [among the others] for final payment to Tri-City as:

1. The terms and provisions of the general contract between the United States Army Corps of Engineers [Owner] and Tri-City [Contractor], as well as the complete contract documents, are incorporated by reference as components of the subcontract, by express provision. Notwithstanding, neither the original contract nor any of its provisions was tendered as evidence. The testimony and exhibits establish [as our discussion elaborates], nevertheless, that the procedures for payment were the same under both the original contract and the subsequent subcontract: during the work progress payment was made on the basis of *performance estimated* by the contractor [or subcontractor], and at the

completion of the work final payment was made on the basis of *performance actually made* by the contractor [or subcontractor] *and approved* by the Corps of Engineers [Owner].

2. The subcontract [§ 3, *Payment* (a)] provided that ten percent of every monthly pay estimate be withheld by the contractor. That retainage, from that December and from every other month of the subcontract life [according to Killian], was never paid over to Killian, even when performance ended and was accepted by the Corps of Engineers.

| Description | Unit | Final Quantity | Amount |
|---|---|---|---|
| Common Excavation | CY | 153,382 | $122,705.60 |
| Rock Excavation | CY | 23,150 | 85,655.00 |
| Embankment | CY | 262,110 | 327,637.50 |
| Aggregate Surfacing | CY | 16,500 | 82,500.00 |

This determination of final payment quantities was transmitted to the general contractor Tri-City by the Corps of Engineers on April 22, 1980, although full payment was not remitted until May of 1981. Tri-City made no further payment to Killian, however, other than as partial liquidation of the supplier accounts and to discharge the International Harvester claim against Killian.

The Tri-City records reflect that, after payment of $42,184.51 on the supplier accounts and to discharge the International Harvester litigation, a balance of $40,366.12 remained owed to Killian on the completed subcontract.[3] To compute that balance, Tri-City subtracted from the *final quantity* determined by the Corps of Engineers as *actually performed* as to each work item [i.e., common excavation, rock excavation, etc.] the *estimated quantity* of each item for which Tri-City received payment on the general contract before assignment of the road relocation project to the B & K partnership [and thence to Killian] for completion. The contract to perform the road relocation project was between Tri-City and the Corps of Engineers, and hence the computation of the final quantities units actually completed was determined and reported by the Corps of Engineers to Tri-City without allocation of the work quantities actually performed by the contractor and subcontractor, respectively.

Killian challenged both the amount reckoned and the method used by Tri-City to reckon the payment due on the completed subcontract. Killian asserted that payment on the road relocation project was due, not on the basis of work quantities estimated, but on work quantities actually performed. To that end, Killian directed engineer Carr, road relocation project manager, to consult the Corps of Engineers cross-sections and other records to determine the quantities actually performed by Killian and Tri-City. These records confirmed and reconfirmed to Carr that the estimates of work for which the Corps of Engineers had paid Tri-City were never actually performed.[4] Carr computed that, after allowance for the amounts paid on the creditor accounts and to International Harvester, Tri-City still owed Killian $67,017.74 for work actually performed under the subcontract.

## POINT I

### Motion for Directed Verdict

The subcontract [§ 25.1] recites: "Tri-City Construction has been paid for the following quantities of work as listed below: ..." These units of work, Killian contends and shows by evidence, were never performed. Tri-City contends that the term *has been paid for the following quantities of work* [when considered with-

---

3. Those entries were dated October 31, 1982, two years after completion of the subcontract and some seventeen months after Tri-City received full payment from the Corps of Engineers for the road relocation project. The evidence does not show that Tri-City ever undertook to acquit its performance under the subcontract by a tender of payment of the $40,366.12 to Killian.

The evidence intimates, rather, that Tri-City harbored a complaint that the neglect by Killian to complete the project by October 14, 1979 was a breach of contract—and so retained the bal-

ance otherwise due as a set-off against the damages occasioned by the untimely Killian performance. That was the cause of action submitted by the counterclaim, and found against, Tri-City.

4. For instance, rather that the 45,265 units of common excavation the subcontract estimates Tri-City performed [and was paid for by the Corps of Engineers], only 16,170 units were completed. Rather than the 38,090 units of embankment work estimated and paid for, only 36,360 were completed.

in the full context of subcontract] so explicitly means *work actually done* as to preclude an extraneous aid to interpretation—and entitle Tri-City to judgment on Count I as a matter of law.

The subcontract adopts by reference, as terms of agreement, "the contract between the Owner [United States Corps of Engineers] and the Contractor [Tri-City]" [Subcontract § 1]. The original contract was never formally tendered as evidence, but the subcontract merely continues the uncompleted performance of Tri-City under the original general contract, and necessarily replicates its essential terms. Tri-City acknowledges that the subcontract and the general contract were unit-bid, and hence undertaken as unit-price construction bargains. *See Rock Hill Asphalt & Construction Company v. State Highway Commission,* 452 S.W.2d 810, 811 (Mo. banc 1970). The unit-price contract is a device used when the final quantities of work cannot be determined accurately until final completion of the work. There are periodic payments made to the general contractor during the work progress—usually per the month—based upon the *estimate* of the architect or engineer, but payment to the contractor under such a device is only for *completed* construction units. *Johnson, Drake & Piper, Inc. v. United States,* 483 F.2d 682, 684 (8th Cir.1973).

■ Tri-City acknowledges that the performance under the subcontract [and, implicitly, the general contract] was of the unit-price genre: that progress payments were due each month from the contractor [Tri-City] upon receipt of the money from the owner [Corps of Engineers] in an amount equal to 90% of the value of the work performed as *estimated* by the Corps of Engineers, but that the partial payment was not an approval that the work was *actually* done. Rather, the final payment due upon complete performance of the project, was for *units of work actually completed, "based upon the engineer's completed unit quantities."* Thus, there is no uncertainty as to what performance the subcontract [and the contract terms integrated into the subcontract] imposes upon the subcontractor, contractor, and owner. [Subcontract §§ 1, 2, and 3]. The payment due to Killian from Tri-City [and hence from the Corps of Engineers] under the subcontract, or to Tri-City from the Corps of Engineers under the general contract is for work-units and quantities actually completed—as determined by the Corps of Engineers. Any partial payment issues on estimate, and does not operate to approve the performance or to confirm that the unit quantities paid for were actually rendered.

Tri-City does not contest that such are the obligations of a unit-price contract, but only that the payments to Tri-City by the Corps of Engineers under the general contract—and restated as § 25.1 of the subcontract—although made during the work progress [and hence on estimate] were for equivalent work-unit quantities actually performed. That is to say: the estimate and the actual performance coincided as to the work quantities § 25.1 of the subcontract describes. Thus, the point the appeal posits, not a question of the construction of a contract, but of fact, and hence of evidence. It was the proof of a fact, however, that Tri-City never attempted, nor within the aspects of the administration of a unit-price contract, a fact open to proof. That is simply because, as our discussion iterates, the determination of the actual work quantities performed by the contractor abided the verification of the engineer *upon completion of the project.* Arlin Vaughn, General Construction Manager for Tri-City, could not say whether Tri-City paid precisely for the work it had done under the general contract—and later assigned to Killian. Cheatham, Resident Engineer for the United States Corps of Engineers on the Truman Dam project—called as a witness for Tri-City—testified that the partial payments on the contractor estimates of the work done "ha[ve] no bearing whatsoever on the final payment." Cheatham, no more than Vaughn, could say whether Tri-City—at the time the contract performance was assigned to Killian—was paid for the actual work done. The proof

lacked altogether on the issue Tri-City asserts as fact: that the partial payments made during the work progress were for equivalent units of work actually performed.

The actual survey of the work-units performed—by which final payment was reckoned—was undertaken by the Corps of Engineers at the completion of the project in December of 1979, and issued to Tri-City, as general contractor, in April of 1980. That determination calculated the units of work completed—and hence the payments due—under the general contract to relocate the roads. That determination encompassed the entire project, and so, the work done by Tri-City under the general contract and by Killian under the subcontract.[5] Those calculations of final quantities, as we note, were not allocated as between performances under the general contract and the subcontract. That was accomplished by engineer Carr on behalf of employer Killian—and that calculation has become the subject of Count I of this suit. That calculation, derived from the Corps of Engineers records, moreover, was aided and corroborated by the figures of the actual yardages earlier removed by Tri-City, given to Carr by Tri-City superintendent Van Cope. Tri-City, to be sure, objects that the calculations derived from the Corps of Engineers records are hearsay and otherwise inadmissible [contentions we take up in turn], but does not impugn nor confute the verity of those computations. Thus, there was neither an issue of a contract term, nor of a dispute of fact. The subcontract provision § 25.1 that *Tri-City Construction has been paid for the following quantities of work* within the context of a unit-price construction contract—which defers final payment until completion of performance and engineer determination of work units actually rendered—recites that the payments were for estimates of work. The issue of fact the Tri-City contention, in effect, posits: that the estimated work quantities § 25.1 describes were actually performed—was without color of evidence, but rather was conclusively refuted. Point I is denied.

## POINT II

### Request For Admissions

A provision of the subcontract [§ 3(c)] allows the contractor [Tri-City] to retain from any payments due the subcontractor [Killian] an amount sufficient to protect itself against the claims of unpaid subcontractor obligations to third parties. In vindication of that contract right, Tri-City submitted to Killian a request for admissions. These requests, under date of January 7, 1981, describe a number of debts to suppliers of the project, and asked Killian to admit they were still owed. The total of that indebtedness was $18,693.86—[the International Harvester litigation, wherein Tri-City was the named defendant, excepted]. Killian never made formal response. In the course of trial, Killian related the inability to meet the accounts of the creditors still owed at the conclusion of the project because Tri-City continued to withhold payment for the estimated work done

---

**5.** The conundrum Tri-City poses by this point on appeal derives from the fact that the subcontract implicitly imposes an obligation on the owner [the Corps of Engineers] that principal was never bound to assume: to allocate the completed unit quantities for the fully performed project as between Tri-City [contractor] and Killian [subcontractor]. That is the sense of § 3 *Payment* (a) of the subcontract whereby the contractor [Tri-City] agrees to pay the subcontractor [Killian] at the specified unit price for the number of units of work completed by the subcontractor *based on the engineer's completed unit quantities.* Tri-City, throughout, argues that the subcontract provided for payment to Killian for "the number of units of work

attributed to it by the Corps of Engineers"—and so it does. But the Corps of Engineers was not a signatory to the subcontract, nor did that principal ever undertake an obligation to allocate the final work performance quantities as between Tri-City and Killian. The obligation of the Corps of Engineers under the usual unit-price construction contract, and under the general contract for the road project with Tri-City, was to determine the unit quantities actually rendered *under the general contract.* The Corps of Engineers never undertook the allocation the subcontract gratuitously imposed. That calculation, as we note, was the initiative of subcontractor Killian.

during that December of 1979. Killian also related that in May of 1980, Tri-City agreed to release sufficient funds to pay sixty percent of the amounts on the debts, and that thereafter, he obtained a loan and paid all the balances. He gave this testimony:

Q. Is there any supplier of any kind, any nature, who has not been paid in full for the project?

A. None whatsoever.

Q. Whatever Tri-City didn't advance, you paid.

A. Yes, sir, I have paid.

That evidence was received without objection. Thereafter, Rettman, Tri-City Controller, presented as a witness for Tri-City, responded on cross-examination:

Q. But as far as all of the suppliers, all of the work that was done, they have all been paid, right?

A. To my knowledge.

In the later trial, counsel for Tri-City was allowed to read the admissions to the jury, and then, in the summation, to argue their effect.

Tri-City argues on appeal that the neglect by Killian to respond to the request for admissions conclusively established them as fact, so that as a matter of law, the verdict returned for Killian on Count I and the judgment for $54,000 entered on that cause of action should be reduced by $18,693.96. Tri-City cites the text of Rule 59.01 subparagraphs (a) and (b), simpliciter, as sanction for the contention.

Rule 59.01(a) provides that the truth of the matter of which an admission is requested is admitted unless an answer or objection addresses the request within the time prescriptions of the rule. Rule 59.-01(b) deems any matter admitted under that procedure *conclusively established unless the court on motion permits withdrawal or amendment of the admission.* That paragraph permits the withdrawal or

amendment when the presentation of the merits of the action are subserved, and the addressor of the request fails to satisfy the court that the withdrawal or amendment will prejudice the action or defense on the merits.

 Thus, composite Rule 59.01 empowers the trial court to accept the default of the party addressed to answer as admissions of the matters requested, and to deem them as conclusively established.[6] *Linde v. Kilbourne,* 543 S.W.2d 543, 546[3, 4] (Mo.App.1976); *Rockwell International, Inc. v. Westport Office Equipment,* 606 S.W.2d 477, 479[1, 2] (Mo.App.1980). The rule accords conclusiveness to admissions for efficacy: so that a party who employs that procedure of discovery may rely that the admission—whether by answer or default—binds the party addressed. *Research Hospital v. Williams,* 651 S.W.2d 667, 669[4] (Mo.App.1983). That is to say [*N.R. v. A.D.,* 655 S.W.2d 733, 736[5] (Mo.App.1983)]: " 'Where no response is made to requests for admissions, *the party making the request is entitled to rely thereupon* and no further proof is required to be made of the facts thus admitted.' " [emphasis added] In that respect, an admission made or deemed under the Rule 59.01 discovery procedure compares with an admission by a party in a pleading. *Williams v. School District of Springfield,* 447 S.W.2d 256, 267[16–19] (Mo.1969). In each case, the admission dispenses with the proof of the fact, and in each case, the admission does not bind the declarant [or tacit declarant] to the fact when the adversary gives it no reliance. *Jenni v. Gamel,* 602 S.W.2d 696, 699[5] (Mo.App.1980). An adversary who adduces evidence on an issue which tends to disprove his own case does not rely upon the admission of the adversary. *Plemmons v. Pevely Dairy Co.,* 241 Mo.App. 659, 233 S.W.2d 426, 434[3] (1950). The evidence then becomes disputed, and the

---

6. Killian would have us treat the testimony given at the trial that the accounts were paid as an "amendment" of the fact of nonpayment admitted by the default to respond to the request for admissions. Were we to assume that the "amendment" terminology of the proviso of

paragraph (b) validly applies to nonanswers as well as to answers, that melioration presupposes an antecedent motion to the court and an order—incidents not in the record. In any event, our decision does not require that we determine the question.

issue is for the trier of fact. *Jenni v. Gamel,* supra, l.c. 699[5].

■ The conduct of the trial as well as the disposition of counsel make clear that Tri-City gave no reliance to the lapsed answers as admissions of the matters requested, whatever their actual verity at the time the requests were posed. Tri-City allowed the Killian responses that those items of supplier account [owed when the requests were submitted on January 7, 1981] were fully paid by the time of trial. Tri-City also allowed its controller to respond to cross-examination that, to his knowledge, all the suppliers by then were paid. That evidence, a complete contradiction to the matters deemed admitted by the neglect to answer, manifested that Tri-City abandoned its pre-trial posture that the matters admitted by the default remained fact, and conceded that whether any amounts were still owed on the accounts was a jury issue. *Jenni v. Gamel,* supra, l.c. 699[5]; *Research Hospital v. Williams,* supra, l.c. 668, fn. 1. It was with that awareness of the legal effect of the Killian and Rettman evidence already received by the jury that counsel for Tri-City acknowledged to the court: "[O]bviously that is an issue for the jury, whether or not they have in fact been paid"—and then requested: "I would like to read this [unanswered request for admissions] to show that there is a conflict in the testimony of Mr. Killian as far as what was paid and what wasn't paid." The admissions were read to the jury, and the contradictions between those deemed responses and the Killian testimony were argued during summation. That the contention of contradiction was heeded may be surmised from the verdict returned on Count I. The evidence of the plaintiff Killian was that $67,017.74 remained due under the subcontract for the completed performance—and that all the subcontract supplier accounts were fully paid. The evidence of the defendant Tri-City was that $40,366.12 was due Killian, and that $18,693.86 in accounts remained unpaid. The jury verdict for Killian on Count I was for $54,000.

The proceedings at the trial demonstrate clearly that Tri-City did not rely on the truth of the matters admitted by the default to answer, either to defend against the Killian claim, or to mitigate it. Whether the supplier accounts had been paid by Killian was an issue of fact properly submitted to the jury, and Tri-City was not entitled to a reduction of judgment by $18,693.96 because of the failure to make response to the request for admissions.

## POINT III
### Prejudgment Interest

■ Tri-City next contends that the verdict for Killian on Count III amounted to an award for prejudgment interest on Count I. Tri-City argues that Count I was for an unliquidated amount, and so, in the absence of contractual authority, accrues interest only from the date of judgment [§ 408.020, RSMo 1978]. Count I was for money due to Killian for work done on the completed subcontract. The argument assumes that Count III asserts a claim for interest on that sum owed, a sum—Tri-City argues—unliquidated until the verdict found that $54,000 was due Killian under the subcontract and entry of judgment for that amount.

Count III does not seek interest, but damage. It pleads a claim—quite apart from the money due for performance—for the cost of money Killian was compelled to borrow to complete the project and pay the account creditors when Tri-City failed to pay upon completion of the work. Killian testified that he borrowed $124,692.44 at an average interest rate of 14.07%, a loan made in December of 1979 when the subcontract project was completed, and yet unpaid at the time of trial. The cost of the loan was $72,523.76. The jury returned a verdict of $35,000. That verdict was a return of damages and not interest. In *Groppel Company, Inc., v. U.S. Gypsum Co.,* 616 S.W.2d 49 (Mo.App.1981), the plaintiff subcontractor agreed to fireproof a structure by means of a spray material manufactured by the defendant. The spray product was somehow deficient, and

a second application to the structure became necessary to meet the density requirement. The extra work was extremely costly, and the subcontractor was compelled to borrow funds to complete the project. The jury award included a sum for the $44,000 in interest paid for the money borrowed. The defendant Gypsum contended that the interest paid on the borrowed funds could not be recovered as damages because the "basic damages [were] unliquidated in nature." The court responded [l.c. 64]:

"Groppel [plaintiff] did not recover 'interest on his damages'; rather, it incurred a cost, an interest charge, on funds borrowed to pay for the respray."

*See also Herbert & Brooner Construction Co. v. Golden,* 499 S.W.2d 541 (Mo.App. 1973). So also, the recovery under Count III was to recoup a cost and not prejudgment interest.

 Nor, in any event, do we agree that the Killian claim for final payment was an unliquidated claim until rendered into a judgment, and so was not entitled to accrue the statutory interest of nine percent per annum from the date of the completion of the contract. The arguments by Tri-City confound the premises which undergird the rule. The principle that interest does not accrue on an unliquidated indebtedness until the rendition of judgment rests on the maxim that a debtor who does not know the amount owed should not be considered in default for failure to pay. *Fohn v. Title Insurance Corporation of St. Louis,* 529 S.W.2d 1, 5[7, 8] (Mo. banc 1975). A demand is regarded as liquidated for the allowance of interest, however, where the amount due is readily ascertainable by computation or determination according to a recognized standard. *Komosa v. Monsanto Chemical Co.,* 317 S.W.2d 396, 400[5] (Mo. banc 1958). Nor does the interposition of an unliquidated counterclaim transmute a demand, otherwise ascertainable into an uncertain amount so as to preclude the recovery of prejudgment interest. *Herbert & Brooner Construction Co. v. Golden,* 499 S.W.2d 541, 553 (Mo.App.1973). The final quantities of the

work actually performed under the general contract were determined by the Corps of Engineers in April of 1980, and contractor Tri-City was then paid in full. There was nothing left to do under the subcontract thereafter but to allocate those determined quantities between Tri-City and Killian on the basis of the Corps of Engineers records—and to pay Killian the unit price for that work. That sum was readily ascertainable by a simple calculation from available records. It was a task Killian ultimately had to do for itself. Tri-City, we note again, contests the competency of that proof [a contention we address], but not its verity. Killian, for whatever reason, made no claim for prejudgment interest, and the awards invest none.

Count III submits and recovers for the damage incurred by payment of interest for a loan made necessary by the Tri-City breach of the subcontract obligation to make payment to Killian as due upon completion of that work. Tri-City distorts that rudimentary theory into a claim for prejudgment interest by inapt argument and citation. The judgment entered on Count III rests on substantial evidence.

### POINT IV

#### Instruction No. 8

 Killian submitted Count I by Instruction No. 8, a modified MAI 26.07; *Verdict Directing—Breach of Bilateral Contract then Substantial Performance Sufficient.* The Notes on Use caution:

"This instruction may be used only in cases where substantial performance is legally sufficient. Use MAI 26.06 where substantial performance may not be submitted."

Instruction No. 8 submits:

Your verdict must be for plaintiff on its claim for the balance due on the contract if you believe:

First, plaintiff entered into an agreement whereby plaintiff agreed to furnish all supervision, labor, tools, equipment, materials and supplies necessary to per-

form, and to perform, all work set forth in the contract in evidence, for the construction of Henry County Road Relocations for the U.S. Army Corps of Engineers, and defendant agreed to pay plaintiff for the performance of the contract per unit price of the number of units for material and work furnished and completed, and

Second, plaintiff substantially performed *its agreement in a workmanlike manner,* and

Third, defendant failed to perform its agreement, and

Fourth, plaintiff was thereby damaged, unless you believe plaintiff is not entitled to recover by reason of Instruction No. 9.

[Instruction No. 9 submits the affirmitive defense of payment.]

Tri-City argues that a dispute subsisted with Killian as to both the terms of the subcontract as well as the breach, and therefore MAI 26.06 was the proper form for the submission of Count I. MAI does indeed impose the 26.06 model when the terms of agreement and the breach are in issue. *Braun v. Lorenz,* 585 S.W.2d 102, 107[1–3] (Mo.App.1979). Tri-City does not say, however, which element of the subcontract, other than the breach, was in contention. The evidence, however otherwise disparate, does not dispute that Killian completed performance under the subcontract in December of 1979, and that the work quantities were computed by the Corps of Engineers, the work accepted, and payment disbursed to Tri-City according to the unit price defined in the general contract [and subcontract]. The only performance which yet remained was payment to Killian. That was the issue—the only issue.

Tri-City argues that the formulation of Instruction No. 8 distorts that issue in that payment, according to the subcontract terms, was for the work quantity performed by Killian as determined by the Corps of Engineers, whereas the instruction submits that Tri-City "agreed to pay [Killian] for the performance of the contract per unit price of the number of units for material and work furnished and com-

pleted"—whatever the determination by the Corps of Engineers. That argument is frivolous. MAI does not require the verdict director to submit an issue not in dispute. *Ideker, Inc. v. Missouri State Highway Commission,* 654 S.W.2d 617, 624[6, 7] (Mo.App.1983). The evidence, both of Tri-City and Killian, agreed that payment—to both Tri-City under the general contract and to Killian under the subcontract—was due as determined by the Corps of Engineers upon completion of the project. That the Killian evidence [through the allocations of engineer Carr] of the payment due from Tri-City under the subcontract rested on the determination by the Corps of Engineers of the completed unit quantities was simply never in dispute at the trial, could not have been misunderstood by the jury, and required no interpolation by instruction. Nor does Instruction No. 8 falter, as Tri-City argues cognately, for failure "to identify what breach by the contractor the jury must find." The theory of Count I, and the evidence in support, was simply that the subcontract was fully performed except for the obligation of Tri-City to pay for the Killian work units. Instruction No. 8, at outset, defines the cause of action to the jury: "Your verdict must be for plaintiff on *its claim for the balance due on the contract,* if you believe," and then in proposition First describes the contract promise: *"defendant agreed to pay plaintiff* for the performance of the contract," and then in proposition Third submits *"defendant failed to perform* its agreement." The jury could not have misunderstood.

■ Tri-City argues also that no payment was due Killian until the claims of third parties were concluded—that the liquidation of these obligations, by the very terms of the subcontract, was a condition precedent to payment for work completed under the subcontract. To entitle a subcontractor to recover the full contract price from a construction contractor, however, the subcontractor need prove no more than substantial performance: that is, workmanlike performance of all important parts of the contract with but slight variations. *Vic*

*Koepke Excavating & Grading Company v. Kodner Development Company,* 571 S.W.2d 253, 257[3, 4] (Mo. banc 1978); *State ex rel. Stites v. Goodman,* 351 S.W.2d 763, 766[1] (Mo. banc 1961). MAI prescribes 26.07 as the model to submit a breach of a bilateral contract [where the terms of agreement are not in dispute] and where substantial performance suffices for recovery—as in a construction subcontract. Instruction No. 8 conforms to that model, and therefore properly submits the theory of Count I; substantial performance of the subcontract terms and nonpayment for that performance. *Forsythe v. Starnes,* 554 S.W.2d 100, 105 (Mo.App.1977).

▇▇▇ What remains is the cavil that Instruction No. 8 fails to submit the condition precedent to recovery that no debts to third persons remained unpaid. The subcontract [an industry form] contains § 3 *Payment* (c)—a usual provision:

in the event of the assertion by other parties of any claim or lien against the Contractor or the premises arising out of the Subcontractor's performance of this Subcontract, *the Contractor shall have the right to retain out of any payments due or to become due to the Subcontractor an amount sufficient to completely protect the Contractor from any and all loss, damage or expense therefrom,* until the situation has been satisfactorily remedied or adjusted by the Subcontractor. [emphasis added]

That proviso does not impose a condition precedent to payment to the subcontractor upon complete performance, but invests the contractor with a resort to setoff against that payment due to the extent that third party claims from the subcontractor performance subsist against the contractor.

In terms of contract principles, a *condition* denotes an event which qualifies a duty. "[A]n event, not certain to occur, which must occur, unless its non-occurrence is excused before performance under a contract becomes due." Restatement (Second) of contracts § 224 (1979); *Highland Inns Corporation v. American Landmark Corporation,* 650 S.W.2d 667,

672[6–9] (Mo.App.1983); 3A Corbin on Contracts § 739 (1960). The terms of subcontract § 3 *Payment* (c) do not require that the subcontractor be free from third party claims before payment may be due, nor do they excuse the Tri-City performance to pay the subcontractor in the event claims by third parties subsist at the time payment is due. The terms simply enable the contractor to retain from the payment otherwise due a sum sufficient to protect against any loss from the claims. Tri-City contended at the trial that Killian continued to owe $18,693.96 to suppliers. Tri-City conceded, however, that even after amounts advanced in partial payment of creditors, $40,366.12 was owed to Killian for the completed performance. Thus, on its own best terms, Tri-City was entitled to retain only $18,693.96 and not to refuse all payment to Killian.

The cause of action by Killian [Count I] for the full balance owed by Tri-City under the subcontract required proof of substantial performance in a workmanlike manner. *Vic Koepke Excavating & Grading Company v. Kodner Development Company,* 571 S.W.2d 253, 257[3, 4] (Mo. banc 1978). The burden was upon Killian to prove these elements, and they were proven. There was no burden on the subcontractor to disprove that any third party claims against Tri-City subsisted in order to recover the cause of action. Tri-City was entitled to the setoff remedy by counterclaim to vindicate the contract right to reduce any recovery on Count I by the amounts of any third party claims still extant against the contractor. *Forsythe v. Starnes,* 554 S.W.2d 100, 106[3, 4] (Mo.App.1977); *Edmonds v. Stratton,* 457 S.W.2d 228, 231[4–9] (Mo.App.1970). What those claims were was a matter best known to Tri-City, and the burden to prove the setoff was upon the contractor. *Vic Koepke,* supra, l.c. 257. Tri-City pleaded no setoff counterclaim to Count I, nor submitted a setoff counterclaim instruction as to Count I. That issue is now foreclosed to the contractor.

## POINT V

### Instruction No. 16

██ Count III was to recover the cost of a loan taken by Killian to pay creditors and to complete the subcontract, made necessary by the failure of Tri-City to remit on the December, 1979 work estimate, and thereafter on the completed subcontract. The claim for that damage was pleaded and submitted as a separate cause of action. Killian proved that the cost of the loan was $72,523.76, but the jury verdict was for $35,000. Count III was submitted by Instruction No. 16:

> Your verdict must be for plaintiff on its claim for damages for breach of contract if you believe:
>
> First, defendant did not pay plaintiff for the performance of the contract, and
>
> Second, because of such failure defendant's contract obligations were not performed, and
>
> Third, plaintiff was thereby damaged, unless you believe plaintiff is not entitled to recover by reason of Instruction Number 17.

Instruction No. 17 submitted:

> Your verdict must be for the defendant on Verdict C if you believe:
>
> First, plaintiff has been paid for the work set forth in the contract in evidence based upon the Corps of Engineers' determination of completed unit quantities; or
>
> Second, plaintiff did not borrow money to complete the performance of the contract; or
>
> Third, plaintiff did not pay any interest as a direct result of any breach of contract.

Tri-City complains that Instruction No. 16 submits the same breach as does Instruction No. 8, and hence duplicates damages. In the terms of the argument: "Respondent [Killian] is entitled to recover once for the same breach of contract." A suitor is entitled to only one redress of a cause of action, but that recovery may encompass more than one element of damage. *Lee v. Guettler*, 391 S.W.2d 311, 313[1–3]

(Mo.1965). [We note that Tri-City does not complain that the submissions are multifarious or split the cause of action, but only that they overcompensate the cause of action.] Count I—submitted by Instruction No. 8—was for the balance due for the workmanlike completion of the subcontract. Count III—submitted by Instruction No. 16—is for a cost incurred to the subcontractor by virtue of the nonpayment of the balance due. Thus, the breach of performance each instruction submits is the same: nonpayment of the balance due. Each returns a discrete damages. The question is whether they duplicate or are otherwise redundant.

██ The damages award for Count I was under MAI 4.08—and expressly defines the return of award in terms of *the balance due plaintiff under the contract* [less any sum necessary to correct any variations—as is required on a claim for substantial performance]. The return of damages on Count I was expressly denied if the jury found that Killian was not entitled to recover by reason of Instruction No. 9—that plaintiff had been paid for the work. Thus, verdict-director Instruction No. 8, affirmative defense Instruction No. 9, and damages Instruction No. 10, confined the award on Count I *to the balance due.*

The damages award for Count III was under MAI 4.01—and defines the return of award in terms of *such sum as you believe will fairly and justly compensate plaintiff for any damages you believe he sustained, etc.* That formulation is general and, unrestricted, could be understood to permit a return for the balance due, among other elements of damage. Instruction No. 17 [presumably an affirmative converse] dispels that danger. That instruction directs the verdict for Tri-City on Count III [Instruction No. 16] if the jury find, among other propositions, that Killian did not borrow money to complete performance of the subcontract, or did not pay any interest as the result of the Tri-City breach. Thus, the jury became fully aware that what was put at stake by that packet of instructions was

the Killian claim for reimbursement for the interest incurred on the money borrowed to complete performance.

The claims for the balance due and for the cost of the money borrowed made necessary by the nonpayment of the balance due were discrete damage elements of the single recovery. They were components of a single cause of action, and so comprised a single submission. *Groppel Company, Inc. v. U.S. Gypsum Company*, 616 S.W.2d 49, 62[21] (Mo.App.1981). The objection of Tri-City is not to a cause of action submitted in fragments, but that the fragments engendered a redundancy of award. The evidence proved two elements of damages: an amount earned on the completed subcontract, and an amount incurred as a loss because the sum owed on the subcontract was not paid. The record shows that whatever the irregularity in the instruction forms, counsel joined issue on the question of damages as submitted, and were not impaired in the presentation of the question of the jury. *Fowler v. Park Corporation*, 673 S.W.2d 749, 756[11, 12] (Mo. banc 1984). Count I and Count III show that neither proof of a damage element impinged on the other. The awards were well within the evidence, and although in the form of multiple verdicts, returned a single compensation.

Tri-City attempts other contentions of error under this point, but they only reiterate points already iterated and answered.

## POINT VI

### THE HEARSAY ISSUE

 The project supervisor for Killian, engineer Carr, was directed to certify the work quantities performed by his employer under the subcontract. The project was completed in December of 1979, and the Corps of Engineers completed the computations on the final quantities performed under the general contract. The Corps transmitted those determinations to the general contractor Tri-City on April 22, 1980, but without allocation as between Tri-City and Killian. Payment issued to Tri-City on

these computations, but Killian was not satisfied that the amount in the offing from Tri-City represented payment for the true quantities performed under the subcontract. That engendered the dispute which this suit consummates.

Carr undertook the task by examination of the records of the work produced and kept by the Corps of Engineers at its office at the project site. These records were voluminous, some 4500 separate items in all. They included the basic cross-sections which delineated the original topography of the area affected, the topography as changed by the plans, and the computations of the work actually done to accomplish the plans. He consulted with the engineer staff from time to time to verify his computations. He entered the recapitulated totals derived from these Corps of Engineers records on an accounting sheet, and that sheet was received as Exhibit 6. The original documents [some 4500] were received as separate Exhibit 13. Exhibit 6 allocates between Tri-City and Killian the actual quantities completed by each according to the work item, and it is on the basis of those computations that the Killian claim for balance due under the subcontract rests.

Tri-City objects that Exhibit 13, the volume of Corps of Engineers records did not qualify as business records, and remained hearsay. Tri-City objects also that Exhibit 6 was merely a handwritten replication of numerals recorded on the original records, and so was hearsay compounded. Exhibit 13 was received as a business record, and Exhibit 6 as a summary of a voluminous business record.

The Uniform Business Records As Evidence Act, § 490.680, provides:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method

and time of preparation were such as to justify its admission.

Killian presented witness Cheatham, Resident Engineer, United States Army Corps of Engineers, custodian of the records of the Truman Dam project. He produced the accumulated records relating to the road relocation contract with Tri-City. These records, he described, comprised plan drawings, surveys, cross-sections of the planned and actual constructions on the project and some two hundred sheets of computations taken from the cross-sections. These computations were derived from on-site measurements during the progress of the work, and then plotted on the cross-sections by the army engineers. The measurements constituted the true record of the work actually done. Thus, Cheatham explained, the measurements were made and entered contemporaneously with the work as performed. This testimony amply qualified the Corps of Engineers documents as evidence under the Act, and they were properly received as Exhibit 13. *Missouri Valley Walnut Company v. Snider*, 569 S.W.2d 324, 328[1–4] (Mo.App.1978); *Matter of the Estate of White*, 665 S.W.2d 67, 69[2–4] (Mo.App.1984).

■ The competency of the compendious relocation project records under the Uniform Business Records As Evidence Act once established, a summary of the records, albeit prepared by a witness who did not enter the original records, is also competent evidence under the Act, provided the records themselves are available to the adversary for cross-examination. *State ex rel. State Highway Commission v. Cone*, 338 S.W.2d 22 (Mo.1960), l.c.25[3]:

> An accountant's summary of voluminous records in court and available to all parties may be admissible in evidence, if otherwise qualified even though the accountant did not make the original records from which the summary was prepared. To render a summary prepared by an expert of voluminous records admissible in evidence, it is the general rule that the competency of the records themselves as evidence must be established and the records made available

able to the opposite party for cross-examination.

*See also Bolling Company v. Barrington Company*, 398 S.W.2d 28, 31[6] (Mo.App. 1965). The original records, all 4500 components, were in court and so accessible for Tri-City to test.

■ Tri-City argues, nevertheless, that summary Exhibit 6 was not the best evidence of the Corps of Engineers measurements of the work quantities performed on the project—that only the original entries sufficed for that proof. The best evidence rule, of course, insists that the terms of a document be proved by the production of the document itself. IV Wigmore on Evidence (Chadbourn Rev.) § 1174 (1972). That is: "[T]he best proof of the contents of a writing is the writing itself." *Padgett v. Brezner*, 359 S.W.2d 416, 422[3–5] (Mo. App.1962). The rule rests on the reason [Wigmore, *id.* § 1180, p. 417]: "As between a supposed literal copy and the original, the copy is always liable to errors on the part of the copyist, whether by wilfulness or by inadvertance; [but] this contingency wholly disappears when the original is produced." The rule which allows a summary of voluminous records as competent evidence, however, does not dispense with the production of the original documents—and hence does not infringe the best evidence principle. The rule operates to enable proof otherwise beyond practicability [Wigmore, *id.* § 1230, p. 535]:

> Where a fact could be ascertained only by the inspection of a large number of documents made up of very *numerous detailed statements* ... it is obvious that it would often be practically out of the question to ... requir[e] the production of the entire mass of documents and entries to be perused by the jury or read aloud to them. The convenience of trials demands that other evidence be allowed to be offered, in the shape of the testimony of a competent witness who has perused the entire mass and will state summarily the net result...

Most courts require, as a condition, that the mass thus summarily testified to shall ... be made accessible to the opposing party, in order that the correctness of the evidence may be tested by inspection if desired, or that the material for cross-examination may be available.

■ This dispels as well the Tri-City contention that summary Exhibit 6 was an untoward invasion of the prerogative of the jury to assess the effect of the original entries without the interposition of expert Carr. The very efficacy of the summary of voluminous records rule rests on the premise that the collation from the original entries was by a witness competent to the task—and for the very purpose to facilitate a jury to understand evidence otherwise too difficult to extrapolate from the sheer mass. *State ex rel. State Highway Commission v. Cone*, supra, l.c.25[3]; Wigmore, *id.* § 1230. The testimony of engineer Carr [compositor of summary Exhibit 6], moreover, was not the rendition of an opinion, as Tri-City argues, but of sums and quantities, albeit interpreted from technical data.

■ Tri-City insists that whatever the competency of original Corps of Engineers records Exhibit 13 under the Uniform Act, the information in summary Exhibit 6 was derived from sources other than the original records—from unnamed Corps of Engineers personnel as well as a Tri-City personage—and so remained hearsay. Indeed, a hearsay statement contained within other hearsay evidence is admissible only where both the statement and the original hearsay evidence are within exceptions to the hearsay rule. Thus, that the original documents [Exhibits 13] were competent as business records does not validate an extraneous hearsay statement contained in an otherwise admissible summary of those business records. *Stegall v. Wilson*, 416 S.W.2d 658, 664[11–14] (Mo.App.1967); McCormick on Evidence § 324.3 *Hearsay Within Hearsay* (3d ed. 1984). The record, however, does not sustain the contention that Killian undertook to prove any issue in dispute by an inadmissible hearsay contained within an admissible hearsay—by means of Exhibit 6 or any other.

■ The records used by Carr to collate the summary were assembled by the Corps personnel at the office where they were kept, and that is where Carr worked. These records contained the computations of actual yardages moved during the work progress. Carr noted these quantities and then transposed them on to an accounting sheet with thirteen columns [Exhibit 6]. In the course of that investigation, Carr asked engineer personnel "to verify where they had come up with some of the figures on their computations." This they did—and presumably the original computation entries were confirmed. It is clear that the occasional question was merely to satisfy a curiosity as to methodology, and that the summary of each work quantity inscribed on Exhibit 6 was the compilation of the numerous original entries on the Corps of Engineers records—without resort to extraneous source.

Tri-City alludes to other hearsay insinuated into the summary composed by Carr from conversations with "an employee of Appellant [Tri-City]." The argument goes that there was "no foundation laid to show these discussions fall under any exception to the hearsay rule," and therefore Exhibit 6 remained inadmissible. We assume that the allusion is to Van Cope, the Tri-City supervisor on the road relocation project. Van Cope was in attendance at the Corps of Engineers office when Carr undertook to reconstruct the computations of the final work quantities and to allocate them between Tri-City and Killian. Carr recapitulated the work units actually performed by Killian and subtracted that sum from the final work quantities already determined by the Corps of Engineers. That allocation rested altogether on those records as the exclusive source. These actual quantities—both the total derived by the Corps of Engineers and the allocation to Killian—were noted on summary Exhibit 6. The dispute between Tri-City and Killian was over two contract items: common excavation [search removed] and embankment

[earth filled]. Thus, the recapitulated allocations as to those two items established the amount of the Killian claim under Count I. In the course of that task at the Corps of Engineers record repository, Van Cope disclosed to Carr the quantities Tri-City had computed as its work actually performed prior to the assumption of the project by Killian under the subcontract. The quantities transmitted by Van Cope to Carr were significantly less than Tri-City claimed as the basis for its determination of the balance due Killian under the completed subcontract, and actually confirmed the allocations derived by Carr and entered on the summary. Carr entered the Van Cope figures in separate columns three [common excavation] and eleven [embankment] as the actual work done by Tri-City on those contract items. Hence, the contention that Exhibit 6 was inadmissible hearsay.

Van Cope testified at the trial and attended throughout as the designated representative of defendant Tri-City. Van Cope never disputed that in fact the figures—later inscribed in columns three and eleven of Exhibit 6—were true. Nor, in fact, has Tri-City ever disputed the verity of the recapitulations and allocations the summary notes. The disclosures by Van Cope to Carr rendered as entries on the summary, in any event, are quite irrelevant to the competency of the allocations to Killian—and hence the foundation for the claim proven as Count I. That is because the proof of Count I depends on the computed allocations to Killian, and not to Tri-City. That proof, entered on the summary, derived from the Corps of Engineers records as the sole source. Thus, the disclosures by Van Cope to Killian—entered on the summary as the allocations due Tri-City [although they confirm the Carr computations]—are extraneous to the proof of Count I, and so, even if hearsay, do not impair the competency of Exhibit 6 to prove the Killian cause of action. Tri-City, we note, does not develop the hearsay argument, no doubt because our decisions do not allow the point as a serious contention. The Van Cope statements to Carr were competent as admissions against interest made by an agent within the course of the ordinary business of the principal and made within scope of his authority. *Yamnitz v. Polytech, Inc.*, 586 S.W.2d 76, 82[10] (Mo. App.1979); *State ex rel. State Highway Commission v. Baker*, 505 S.W.2d 433, 436 (Mo.App.1974). Exhibit 6 was competent evidence.

## POINT VII

### Miscellaneous

Tri-City contends also that a letter from Butts [the former Killian partner] to Tri-City was hearsay and improperly admitted as Exhibit 3. That correspondence was a litany of complaint by B & K that the ineptness of the Tri-City survey and pipe crews delayed the Killian [then B & K] work progress and idled the workers to its cost. That evidence, whatever its competency, bore on the proof of Count II, for the reasonable value of equipment and services furnished above the contract terms. That claim for extras was rejected by the jury. Any error from that evidence, therefore, was cured.

The brief on appeal asserts numerous other subpoints, fragmentary and undeveloped, often redundant, and already answered. It serves no purpose even to restate them.

The judgment is affirmed.

All concur.