**BUSINESS MEN'S ASSURANCE COMPANY OF AMERICA, Respondent–Appellant,**

v.

**Bruce GRAHAM, et al., Appellants– Respondents.**

**No. WD 45876.**

Missouri Court of Appeals, Western District.

Nov. 8, 1994.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 27, 1994.

Application to Transfer Denied Feb. 21, 1995.

Lawrence M. Berkowitz, Kansas City, for appellant-respondent.

Roy C. Bash, Kansas City, for respondent-appellant.

Before BRECKENRIDGE, P.J., KENNEDY, J., and SHANGLER, Senior Judge.

BRECKENRIDGE, Presiding Judge.

Bruce Graham, as the representative of the current partners of Skidmore, Owings & Merrill, appeals from the judgment entered on the jury verdict against Skidmore, and in favor of Business Men's Assurance Company (BMA), in the amount of $5,287,991.87. Skidmore raises seven points on appeal arguing that the trial court erred in: A) denying Skidmore's motion for a directed verdict on its statute of limitations defense; B) refusing to submit Skidmore's statute of limitations defense to the jury as an affirmative defense; C) refusing to give Skidmore's comparative fault instruction; D) submitting the issue of damages to the jury under a cost-of-repair measure of damages and refusing Skidmore's instruction on the issue of damages; E) submitting Instructions 8, 11 and 14 to the jury on the issue of prejudgment interest; F) submitting BMA's negligence and negligence per se claims to the jury because they were based on purely economic loss; and G) sub-

mitting BMA's negligence per se claim to the jury because BMA failed to state a claim for negligence per se.[1] BMA cross-appeals from the trial court's refusal to submit its punitive damages claim to the jury.

After granting BMA's motion for a rehearing, this court finds that the trial court erred in failing to submit the statute of limitations issue to the jury, in awarding BMA damages for loss of use of money and in submitting BMA's negligence per se claim to the jury as a cause of action. This court reverses the denial of Skidmore's affirmative defense of statute of limitations and the award of damages for BMA's loss of use of money. We affirm the remaining provisions of the judgment and order that they be held in abeyance, pending remand for a new trial on the issue of statute of limitations only.

In 1960, BMA contracted with Skidmore, an architectural firm, to design the BMA Tower which was to be built in Kansas City, Missouri. Skidmore specifically agreed to furnish professional services to BMA in connection with design and construction of the BMA Tower, including preparation of preliminary design documents and final construction documents, consisting of drawings, outlining specifications, preliminary cost estimates, and models or renderings, working drawings and specifications for architectural, structural, civil, mechanical and electrical engineering work. Skidmore agreed to provide professional services to assist in the taking of bids, selection of contractors and the development of construction contracts, checking of contractors and manufacturer's shop drawings, approval of material samples, issuance of certificates of payment, and full-time supervision of construction by an architectural superintendent on site who was to be responsible for "the coordination, performance and completion of all architectural, structural, civil, mechanical and electrical engineering work in accordance with approved drawings and specifications." Further, Skidmore agreed to use its best efforts to protect BMA against defects and deficiencies in the work of con-

1. This opinion will refer to Skidmore's points relied on by letter rather than by number be-

cause that is the manner in which Skidmore organized its appeal brief.

tractors, but did not guarantee performance by contractors of their contracts.

Construction of the building began in 1961 and was completed in 1963. The exterior of the building consisted of over four thousand panels of one-and-one-fourth inch thick white marble, described as marble cladding. The building has vertical columns with horizontal cross pieces, called spandrels, connecting the columns at each floor. The marble panels covered all four sides of the building's vertical columns and, at each floor level, marble was installed on the outside face of the horizontal spandrels. The individual pieces of marble were attached to the frame of the building with metal anchors. The windows are set approximately eight feet back from the edge of the building and this overlap is called the gallery.

In May of 1985, three of the marble panels fell from their installed positions. Two of the three panels fell from the spandrels. The third panel fell from the penthouse section of the building.[2] BMA notified Skidmore in June of 1985 that the panels had fallen. BMA also hired Black & Veatch to perform tests on the marble to determine what caused the panels to fall. Black & Veatch discovered that there were significant design problems with regard to the marble and the anchoring system. The thin marble cladding system failed to meet the minimum requirements of the Kansas City Building Code. Black & Veatch also found that the properties of the marble at the original installation date failed to meet industry standards for the early 1960's and, with the passage of time, the marble had warped, cracked and lost strength.

In addition, Black & Veatch identified workmanship anomalies in that the anchor system for the marble cladding was not constructed in accordance with specifications. At a minimum, twenty-five percent of the anchors specified were either missing or were of an incorrect type. All of the anchors installed were one-sixteenth of an inch thick rather than the specified one-eighth of an inch. A significant number of the anchors were not embedded in the dovetail slot to the required depth, were not even inserted into the dovetail slot or there was was no dovetail slot. Some anchors were not inserted into the slot, but were attached by molding cement or a Ramset nail. In the areas where a wire anchor was specified, in many instances the wire was missing, the wire was not anchored into the dovetail slot or there was no dovetail slot. The bearing of the marble panels on the shelf angles did not meet the specification of three-fourths of an inch. The bearing on quite a few panels was less than one-half inch, some almost zero. Where the marble panels formed a corner around the columns, the specifications called for a stainless steel cramp anchor. Copper was used in every instance instead of stainless steel.

Black & Veatch prepared a report which indicated that it could not guarantee the building's safety. After considering two possible methods of repair, Black & Veatch determined that neither method would guarantee the building's safety and recommended that the panels be removed and replaced. BMA decided to remove the marble panels on the building and replace them with a synthetic crystalline material called neoparium. The cost of the replacement was approximately four million dollars. BMA filed suit against Skidmore on August 12, 1986 for negligence and breach of contract.[3]

Skidmore moved for summary judgment prior to trial on the basis that §§ 516.100 and 516.120, RSMo 1986,[4] required BMA to file its action within five years of the time when the damage resulting from Skidmore's breach of contract or duty was sustained or capable of ascertainment. Skidmore maintained that BMA's damages were sustained and capable of ascertainment long before August 12, 1981 and, as a result, BMA's claims were barred. BMA opposed sum-

---

2. The area referred to as the penthouse is on the top of the building and houses much of the building's mechanical equipment.

3. This suit initially included a number of defendants in addition to Skidmore. Those claims were either settled or dismissed prior to trial.

This suit also originally included a count for misrepresentation which was not pursued at trial.

4. All statutory citations are to Revised Missouri Statutes 1986, unless otherwise indicated.

mary judgment and claimed that it would present evidence at trial to dispute Skidmore's contentions. The trial court reserved ruling on Skidmore's summary judgment motion until trial.

There was evidence at trial that the incidents in May of 1985, although the first time entire panels had fallen from the building, were not the first problems BMA had experienced with the marble panels. A cracked panel, which did not fall from its installed position, was replaced in the late 1960's. As early as the winter of 1966–67, BMA experienced problems with chipping of the marble panels in specific areas of the building. The design of the building included the placement of an aluminum cap over the gap between the gallery edge and the top edge of the horizontal spandrel panels. The cap met the bottom corner of the vertical column panels where the column intersected with the gallery on each floor. The aluminum cap expanded when exposed to heat causing the bottom corner of some column panels to chip and fall to the gallery. After consulting Skidmore, expansion joints were cut in the aluminum caps to remedy this problem. The evidence also showed that, in 1975, the joints between the marble panels and the frame to which they were attached were recaulked.

At trial Skidmore and BMA each offered the testimony of a witness who had responsibility for some aspect of the maintenance of the BMA Tower. Skidmore presented deposition testimony from Robert Hicklin, the maintenance carpenter responsible for maintaining the exterior of the building from 1966 until his retirement in 1983. Hicklin did not work directly for BMA. He was employed first by IT & T and then by Penn Valley Management, both entities owned by BMA.

While he was the maintenance carpenter, Hicklin reported exclusively to Mark Crew, except for the last year of his employment when Crew was retired. Crew was a witness for BMA. Crew served as secretary to the building committee during the time the BMA Tower was being constructed. In that position he was BMA's on-site representative during the construction. After the completion of construction, Crew became building manager. He served in that position until he was promoted to director of BMA Tower services, the position he held at his retirement.

Hicklin testified that every winter during his employment at the BMA Tower, pieces of marble from the corners of the column panels would break off and fall onto the gallery decks. Hicklin testified that some of these pieces were reattached by Carthage Marble. Because Hicklin thought Carthage Marble's method was ineffective and employees of Carthage Marble were only rarely available, he developed his own method of reattaching the broken pieces with Dow Corning 780. During three months of every year when the temperature was over 50 degrees, Hicklin did repair work on the marble. He stated that this repair work began the first day he went to work and continued until the day he retired.

Hicklin testified that each spring, beginning in the first year of his employment, he would inspect the building. In addition to the broken pieces of marble, he noticed marble panels protruding from their original positions about one-half inch. Hicklin observed that the problems with the marble became worse with the passage of time.

Hicklin testified he advised Crew of the chipping problem from the first year of his employment and Crew was aware that he was reattaching the broken pieces. Hicklin also reported to Crew his observations that the marble panels were protruding and warned Crew that it was only a matter of time before an entire panel fell from the building.

Crew's testimony was in conflict with that of Hicklin. Crew testified that the chipping problem at the corners of the marble panels was remedied by the end of 1968 when the expansion joints were cut in the aluminum caps. Crew testified that after the expansion joints were enlarged in 1968 and the panels recaulked in 1975, he had not witnessed any problems with the marble. He also stated that he did not recall having been told of any problems with the marble. He further testified that there was no one in charge of maintenance of the exterior of the building,

because there was not supposed to be any maintenance required.

On the basis of the statute of limitations defense, Skidmore filed a motion for directed verdict at the conclusion of BMA's evidence and at the conclusion of all the evidence. BMA argued in opposition to the motions that Missouri law required the trial court, and not the jury, to decide statute of limitations issues. Skidmore maintained that factual issues regarding the statute of limitations must be submitted to the jury unless the court directed a verdict in Skidmore's favor on the basis of undisputed evidence. The court submitted the case to the jury on claims of breach of contract, negligence and negligence per se and reserved ruling on the submissibility of the statute of limitations defense and punitive damages. The jury returned verdicts in favor of BMA on its alternative claims of negligence, negligence per se and breach of contract in the amount of $3,995,592.77, the cost of the repair, and $1,710,661.91, the loss of use of money on this expense. The trial court reduced BMA's damage award by $400,000.00, which is the amount BMA received pursuant to a settlement agreement between Winn–Senter Construction Company and Carthage Marble Company. The court further reduced BMA's award for loss of use of money by $18,262.81, which represents receipt and use by BMA of the settlement amount from February 28, 1991, the date of the settlement, to October 23, 1991, the date of the verdict.

After the return of the verdicts, the trial court announced that it would not submit the issue of punitive damages to the jury because it was "not a punitive damages case." The court also decided that the statute of limitations issue was a question of law and should be decided by the court rather than the jury. After discharging the jury, the court heard argument and took additional evidence on the statute of limitations defense. Thereafter, the trial court entered a judgment which found in favor of BMA on the statute of limitations issue and awarded BMA judgment in the sum of $5,287,991.87.

Skidmore filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. BMA filed its motion for a new trial on the issue of punitive damages. The trial court denied these motions. Skidmore filed a timely appeal thereafter. BMA filed a timely cross-appeal.

Skidmore contends in its first point on appeal, Point A, that the trial court erred in denying Skidmore's motion for a directed verdict on its statute of limitations defense because §§ 516.100 and 516.120 provide an affirmative defense to actions for breach of contract or negligence filed more than five years after accrual of the cause of action.[5] Skidmore argues that the undisputed evidence at trial established that, as a matter of law, BMA's claim is barred by the statute of limitations because BMA suffered damage capable of ascertainment more than five years before this action was filed.

■ Under §§ 516.100 and 516.120, BMA was required to file its action within five years of the time when the damage was sustained and capable of ascertainment. BMA filed this action on August 12, 1986. If its damages relating to the design and the deficient marble installation were sustained and capable of ascertainment prior to August 12, 1981, its claims in the instant case are barred. Skidmore had the burden at trial of proving the statute of limitations as an affirmative defense. *Stewart v. K–Mart Corp.*, 747 S.W.2d 205, 208 (Mo.App.1988).

■ In Missouri, discovery of the damage is not the event that triggers the statute of limitations. *Modern Tractor & Supply v. Journagan Const.*, 863 S.W.2d 949, 952 (Mo. App.1993); *Lato v. Concord Homes, Inc.*, 659 S.W.2d 593, 594–95 (Mo.App.1983). The statute of limitations begins to run when the right to sue arises. *Modern Tractor*, 863 S.W.2d at 952; *Lato*, 659 S.W.2d at 594–95. The damage must be actually sustained and capable of ascertainment before the statute of limitations begins to run. *Modern Tractor*, 863 S.W.2d at 952; *Hasemeier v. Metro Sales, Inc.*, 699 S.W.2d 439, 441 (Mo.App. 1985). The phrase "capable of ascertain-

---

5. The parties agree that § 516.100, the five-year statute of limitations, applies to BMA's claims for breach of contract, negligence and negligence per se.

ment" refers to the fact of damage rather than the exact amount. *Modern Tractor,* 863 S.W.2d at 952; *Hasemeier,* 699 S.W.2d at 442. Damage resulting from one wrong that continues and becomes more serious over time does not extend the time within which suit may be brought. *Arst v. Max Barken, Inc.,* 655 S.W.2d 845, 847 (Mo.App.1983). In order to prove that it was entitled to a directed verdict as a matter of law, Skidmore had to present undisputed evidence that BMA could have ascertained the damage prior to August 12, 1981. Skidmore's motion for directed verdict should only have been granted if there were no factual issues remaining for the jury to decide. *Jerry Anderson & Assoc. v. Gaylan Ind.,* 805 S.W.2d 733, 735 (Mo.App.1991).

■ Skidmore argues that the evidence at trial was undisputed in that the damages from Skidmore's alleged wrongful conduct were sustained and became capable of ascertainment by 1968. Skidmore asserts that Hicklin's testimony was undisputed that pieces of the panels fell from the building continuously from 1966 to 1983. Skidmore also argues that its evidence showed that BMA was aware during this time that whole panels were misaligned and protruding.

Skidmore's assertions that its evidence at trial was undisputed are without merit. The evidence at trial as to when the damage could have been ascertained was conflicting and could have resulted in opposite conclusions. BMA presented Crew's testimony to contradict the testimony of Hicklin. Crew testified that there were no problems with the panels between 1968 and 1985 when the three panels fell from the building. Crew testified *that he had not witnessed chipped, warped or protruding panels,* nor had he been told of such. In 1969, BMA purchased six additional panels which it kept on hand in case of an emergency. Hicklin indicated that the panels were purchased after his reports of the protruding panels because BMA was afraid panels were going to fall from the building. Crew contradicted Hicklin's testimony by testifying that Skidmore recommended the purchase of extra panels because the panels might become difficult to find as time passed and because marble purchased several years

after the panels on the building would be incompatible due to different veining in marble mined from differing depths.

BMA's evidence contradicted Hicklin's testimony that the damages were ascertainable prior to August 12, 1981. The conflicting testimony created disputed issues of fact which prevented Skidmore from being entitled, as a matter of law, to a directed verdict on its affirmative defense of statute of limitations. The trial court did not err in denying Skidmore's motion for a directed verdict. Point A is denied.

Skidmore argues in Point B that the trial court, having denied Skidmore's motion for a directed verdict on the statute of limitations defense, erred in refusing to submit to the jury Instruction E regarding Skidmore's statute of limitations affirmative defense. Skidmore argues that it was entitled to have this defense submitted to the jury because there was sufficient evidence for the jury to conclude that BMA had suffered damage capable of ascertainment more than five years before it filed this action.

As discussed in Point A, the evidence at trial was conflicting and contradicted as to when BMA could have ascertained the damage. Genuine issues existed regarding when the damage to BMA was sustained and capable of ascertainment. BMA argues that Skidmore failed to establish a causal connection between the chips and cracks in the marble panels and the damage sustained in 1985 when the panels fell from the building. BMA contends that the chips and cracks are completely unrelated to the damage sustained in 1985. Skidmore presented evidence that the falling panels were part of continuing damage which manifested itself in the form of chips, cracks and protruding panels of marble. Hicklin testified that he anticipated and feared, because of the misalignment of the panels, that entire panels would eventually fall. BMA presented the testimony of Crew contradicting Hicklin's testimony. Issues of witness credibility and believability existed which required resolution by the jury.

■ Statute of limitations issues are to be submitted to the jury if contradictory conclu-

sions can be drawn from the evidence. *Kansas City v. W.R. Grace. & Co.,* 778 S.W.2d 264, 268 (Mo.App.1989); *Hopkins v. Goose Creek Land Co., Inc.,* 673 S.W.2d 465, 469 (Mo.App.1984); *See also Arst,* 655 S.W.2d at 848. *Grace* is most analogous to the instant case. In *Grace,* there were issues of fact as to when asbestos fibers were released into the environment and when the plaintiff was capable of ascertaining a risk of harm from the release. *Grace,* 778 S.W.2d at 271.

BMA cites *Anderson v. Griffin, Dysart, Taylor, Penner,* 684 S.W.2d 858, 861 (Mo. App.1984), to support its assertion that the issue of accrual of a cause of action is to be decided as a matter of law by the trial judge. *Anderson* is distinguishable from the instant case because it involves a legal malpractice claim in which there were no disputed issues of fact. The trial court granted the respondent's motion to dismiss and no evidence was presented. In doing so, the court assumed that the facts in the petition were true. *Id.* at 859. Unlike *Anderson,* the instant case involves a dispute as to whether the falling panels are a part of the same damage as the chips and cracks, and whether BMA was aware of the protruding panels.

In the instant case, the parties presented contradictory evidence creating disputed factual issues as to when the damage was sustained and capable of ascertainment. As a result, the trial court should have submitted the statute of limitations issue to the jury. *Grace,* 778 S.W.2d at 268. Point B is sustained. The denial of Skidmore's affirmative defense that BMA's claims are barred by the statute of limitation is reversed.

In Point C, Skidmore argues that the trial court erred in refusing to submit Instruction C, a comparative fault instruction proffered by Skidmore. Skidmore asserts that evidence of BMA's negligence in failing to maintain the building entitled Skidmore to have the jury decide whether BMA's acts or omissions contributed to its claimed damages.

BMA argues that Skidmore was not entitled to a comparative fault instruction be-

cause it did not plead contributory negligence as an affirmative defense and did not request a comparison of fault in its answer. BMA asserts that Skidmore's evidence fails to establish a causal relationship between its alleged failure to maintain the building and the damages sustained by BMA. BMA also contends that the evidence does not contain expert testimony to support Skidmore's claims that BMA's failure to inspect and recaulk the panels caused damage.

█ Comparative fault is an affirmative defense in which the party asserting it must prove that the actions or omissions of the opposing party contributed to the asserting party's loss and negated or reduced the asserting party's legal responsibility. *Young v. Kansas City Power and Light Co.,* 773 S.W.2d 120, 126 (Mo.App.1989). Rule 55.08 requires that a party set forth all affirmative defenses in its answer, and the court in *State ex rel. Taylor v. Luten,* 710 S.W.2d 906, 907 (Mo.App.1986), held that Rule 55.08 applies to the assertion of comparative fault.

█ The Missouri Supreme Court adopted the pure form of comparative fault in *Gustafson v. Benda,* 661 S.W.2d 11, 15 (Mo. banc 1983), and declared that Missouri would follow the Uniform Comparative Fault Act (UCFA), 12 U.L.A. 35 (Supp.1989).[6] Under the UCFA, the failure to mitigate damages is fault which reduces the plaintiff's recovery. *Id.* at § 1(b). The Missouri Supreme Court recognized this interpretation of fault in *Love v. Park Lane Medical Center,* 737 S.W.2d 720, 724 (Mo. banc 1987), when it wrote "[n]egligence is but one type of fault; fault also includes avoidable consequences, including mitigation of damages." *See also Young,* 773 S.W.2d at 125.

In its answer to BMA's petition, Skidmore pled as its fifth affirmative defense that "BMA failed to mitigate its damages." Skidmore's pleading set forth the specific ground, mitigation of damages, upon which it was entitled to a comparative fault instruction rather than pleading comparative fault gen-

---

6. Subsequent Missouri Supreme Court opinions have indicated that it was not the court's intent in *Gustafson* to enact the UCFA as a virtual statute of the state of Missouri. *Lippard v. Houd-* *aille Industries, Inc.,* 715 S.W.2d 491, 492–93 (Mo. banc 1986). Such holding, however, does not affect the issues in the instant case.

erally. BMA claims that this averment is insufficient.

When a party asserts an affirmative defense, the pleading "shall contain a short and plain statement of the facts showing that the pleader is entitled to the defense or avoidance." Rule 55.08. Because the purpose of Rule 55.08 is to provide notice to the plaintiff, *Lucas v. Enkvetchakul,* 812 S.W.2d 256, 263 (Mo.App.1991), the facts supporting a defense must be pled in the same manner as they would be with claims. *Ashland Oil, Inc. v. Warmann,* 869 S.W.2d 910, 912 (Mo. App.1994). Mere conclusory allegations constitute inadequate pleadings. *Id.*

In its answer, Skidmore failed to state additional facts pertaining to its affirmative defense of comparative fault. It asserted only the conclusory allegation that BMA had failed to mitigate damages, rather than stating facts which supported this defense. Nonetheless, pursuant to Rule 55.27(d), BMA should have submitted a motion for a more definite statement. Since BMA did not make such a motion, it is deemed to have waived the objection according to Rule 55.27(f). *Clark v. Olson,* 726 S.W.2d 718, 719 (Mo. banc 1987) (holding that the defendant in a fraud action waived its objection to pleadings deficient in particularity, since the defendant failed to make a motion for a more definite statement); *Sirna v. APC Bldg. Corp.,* 730 S.W.2d 561, 566 (Mo.App.1987) (holding that objections to a conclusory pleading which is deficient in matters of particularity and detail are waived without a motion to make a more definite statement or a motion to dismiss).

Having decided that BMA waived its argument against Skidmore's pleadings, this court must next address whether Skidmore was entitled to a jury instruction on comparative fault. A comparative fault instruction must be supported by substantial evidence. *Young,* 773 S.W.2d at 125. "Substantial evidence is that which, if true, has probative force upon the issues and from which the trier of facts can reasonably decide a case." *Sheridan v. Sunset Pools of St. Louis,* 750 S.W.2d 639, 641 (Mo.App.1988). In examining whether substantial evidence existed, the evidence must be viewed in the light most favorable to the party offering the instruction. *Young,* 773 S.W.2d at 125.

The defendant bears the burden of proof as to mitigation of damages and must show that the injured party had an opportunity to mitigate and the reasonable prospective consequences. *Smith v. City of Miner,* 761 S.W.2d 259, 260 (Mo.App.1988); *Shaughnessy v. Mark Twain State Bank,* 715 S.W.2d 944, 955 (Mo.App.1986). The rule of mitigation of damages only bars recovery as to those damages which could have been avoided if reasonable precautions, reasonably known to the injured party, were exercised. *Fletcher v. City of Independence,* 708 S.W.2d 158, 175 (Mo.App.1986).

Skidmore presented evidence that BMA did not have a regular schedule for maintenance or inspection of the marble. The director of BMA Tower services, Mark Crew, indicated that he knew that it was normal procedure to caulk between the joints of the marble to prevent moisture or water from getting behind the panels. He also testified that caulk needs to be replaced when it is not preventing water and moisture from getting behind the marble panels. The caulking on all the marble panels was, in fact, replaced in 1975.

Hicklin, a maintenance carpenter at the BMA Tower, testified that the only thing wrong with the marble was the sealer which did not keep the water out. He stated:

> Each winter the water would get in behind the marble and as I inspected the building each spring as soon as the weather would permit me doing it I would find pieces of marble that was out a half inch, which I know there was only one thing could have did that and that was a defective caulking that let water in behind it and it froze and it come out some.

Hicklin's testimony as a whole, however, makes it clear that he did not observe water freezing behind the panels. Instead, he formed his opinion that the source of the protruding panels was a failure of the caulking, because he could not see any other cause for the protrusion of the panels.

Joseph Remmers, the Black & Veatch engineer who supervised removal of the marble panels, testified that he observed widespread rust when the marble panels were removed indicating that there had been moisture infiltration behind the panels. Remmers acknowledged that caulking was important to prevent water from getting behind the panels due to the fact that water causes concrete to deteriorate and corrodes most metals. Remmers observed gaps in the existing caulking where panels evidently warped away from the structure, pulled off their anchors and slid out a little. He testified that the caulk also tore when the weight of improperly anchored panels pulled down on the caulking.

Remmers identified the primary source of the moisture behind the panels, however, to be the design of the marble cladding which required caulking on only three sides of each panel. Along the bottom of each panel there was a gap between the panel and the concrete structure of the building which left the anchorage system open to atmospheric conditions, including water vapor.

This evidence supports Skidmore's position that there was noticeable moisture damage behind the panels. The evidence, however, does not attribute any significant portion of the damage to a lack of maintenance. The evidence instead identifies the real cause of the moisture problem to be the design of the panel system which permitted water vapor to get behind the panels. In addition, there is no evidence that the rusting anchors and mold behind the panels were factors in the decision to replace the marble cladding. The evidence does not warrant a jury instruction on comparative fault. Point C is denied.

Skidmore argues in Point D that the trial court erred in submitting the issue of damages by Instructions 8, 11 and 14 and in refusing Skidmore's Instruction D on the issue of damages. Skidmore asserts that the proper measure of damages in the instant case was the lesser of either the cost of repair or the diminution in value. Skidmore claims that the diminution in value should be determined by calculating the difference in 1963 between the value of the building as designed and the value as constructed.

The court instructed the jury that the measure of damages was "the reasonable cost of repairing any damage to the BMA Tower, plus such sum as ... will fairly and justly compensate plaintiff for the loss of use of its money expended ..." for that repair. The trial court refused Skidmore's Instruction D, which was a modified form of MAI 4.02. Instruction D stated that the measure of damages for breach of contract was the lesser of the cost of repair or the difference in the value of the building as contracted and as built, "measured at the time the Tower was constructed."

■■■■■ The proper measure of damages is a question of law for determination by the trial court. *De Long v. Broadston*, 272 S.W.2d 493, 497 (Mo.App.1954). The general rule in Missouri for damages to real property is the diminution in value test which is calculated by determining the difference between the fair market value before and after the event causing the damage. *Tull v. Housing Auth. of City of Columbia*, 691 S.W.2d 940, 942 (Mo.App.1985). The cost of repair test, an exception to the general rule, may be used when the cost of restoration is less than the diminution in value. *Id.* The diminution in value method measures damages as the difference between the value of the property with the defective work and what the property's value would have been if it had been constructed according to the contract terms. *Lawing v. Interstate Budget Motel, Inc.*, 655 S.W.2d 774, 778 (Mo.App.1983). Under the cost of repair method, damages are measured as the cost of repairing the defects or supplying the omissions to make the building or structure conform to the contract plans and specifications. *Id.; see also White River Dev. v. Meco Systems*, 806 S.W.2d 735, 741 (Mo.App.1991).

Application of the cost of repair test is clearly limited to situations where repairs are only a small percentage of the diminution in value. *Tull*, 691 S.W.2d at 942. To qualify for the cost of repair exception, the plaintiff must present evidence showing that the cost of repair is insignificant to the total market value of the building. *Sharaga v. Auto Owners Mut. Ins. Co.*, 831 S.W.2d 248, 252 (Mo. App.1992); *DeArmon v. City of St. Louis,*

525 S.W.2d 795, 801 (Mo.App.1975); *De Long,* 272 S.W.2d at 497. In order to make such a comparison, the plaintiff's evidence must include evidence of the fair market value of the building. *De Long,* 272 S.W.2d at 497. Fair market value is defined as the price at which the property could be sold by a willing seller to a buyer who is under no compulsion to buy. *Sharaga,* 831 S.W.2d at 253.

The particular facts and circumstances of each case dictate which measure of damages is appropriate.[7] *Kahn v. Prahl,* 414 S.W.2d 269, 282 (Mo.1967); *Hensic v. Afshari Enterprises, Inc.,* 599 S.W.2d 522, 524–25 (Mo.App.1980). In recent years, appellate courts have found the facts and circumstances of construction cases, where there is substantial but defective performance by a contractor, dictate a measure of damages different from the measure of damages in customary cases involving injury to real property. *Compare White River,* 806 S.W.2d at 741 (holding that the general rule for damages in construction cases is the cost of repair, and that diminution in value is only appropriate where the cost of reconstruction would involve unreasonable economic waste) and *Lawing,* 655 S.W.2d at 778 (holding that the general rule for damages in construction cases is the cost of repair) *with Tull,* 691 S.W.2d at 941–42 (holding that, in non-construction situations, the general test for damages is diminution in value).[8]

Although the measure of damages available to an owner in a defective construction case is "cost of repair" and the "diminution in value," the same as for general real property, *White River,* 806 S.W.2d at 741; *Lawing,* 655 S.W.2d at 778; *Hensic,* 599 S.W.2d at 524, it is the manner in which these methods are applied that is different. In real property cases, courts generally utilize the "diminution in value" test, turning only to the "cost of repair" test when it

constitutes a lower amount of recovery. *Tull,* 691 S.W.2d at 942. In defective construction cases, on the other hand, the "cost of repair" test is favored, so that courts normally determine the damages by assessing the cost of correcting the defects or supplying the omissions. *Stege v. Hoffman,* 822 S.W.2d 517, 520 (Mo.App.1991); *White River,* 806 S.W.2d at 741; *Rust & Martin, Inc. v. Ashby,* 671 S.W.2d 4, 6 (Mo.App.1984); *Lawing,* 655 S.W.2d at 778; *Forsythe v. Starnes,* 554 S.W.2d 100, 109 (Mo.App.1977); *North Cty. Sch. Dist. v. Fidelity & Deposit Co.,* 539 S.W.2d 469, 480 (Mo.App.1976); *Edmonds v. Stratton,* 457 S.W.2d 228, 233 (Mo.App.1970); 13 Am Jur.2d *Building and Construction Contracts* § 79 (1964).

An exception to the general rule for defective construction cases occurs when the cost of reconstruction and completion in accordance with the contract would involve unreasonable economic waste. *White River,* 806 S.W.2d at 741; *Rust & Martin,* 671 S.W.2d at 6–7; *Lawing,* 655 S.W.2d at 779; *Forsythe,* 554 S.W.2d at 109; *North Cty. Sch. Dist.,* 539 S.W.2d at 480; 13 Am.Jur.2d *Building and Construction Contracts* § 79 (1964). In the instance where the cost of repair method would result in the destruction of usable property or would be grossly disproportionate to the results obtained, the owner's damages should be calculated by the diminution in value formula. *White River,* 806 S.W.2d at 741; *Rust & Martin,* 671 S.W.2d at 6–7; *Lawing,* 655 S.W.2d at 779; *Forsythe,* 554 S.W.2d at 109; *North Cty. Sch. Dist.,* 539 S.W.2d at 480; 13 Am.Jur.2d *Building and Construction Contracts* § 79–80 (1964). The contractor has the burden of proving that repairing the defect would result in unreasonable economic waste. *Rust & Martin,* 671 S.W.2d at 8.

Skidmore's argument on appeal, that damages in this case should be measured by using the diminution in value method, is not

---

7. When there are a number of defects, one method may be appropriate for some, while the other method may be proper for others. *White River,* 806 S.W.2d at 741.

8. An exception exists, however, for cases involving a breach of the implied warranty of habitability in the construction of new residences. In

those situations, the general rule applies. *See Major v. Rozell,* 618 S.W.2d 293, 296 (Mo.App.1981); *Ribando v. Sullivan,* 588 S.W.2d 120, 124 (Mo.App.1979); *Matulunas v. Baker,* 569 S.W.2d 791, 796 (Mo.App.1978); *Stamm v. Reuter,* 432 S.W.2d 784, 786 (Mo.App.1968).

advanced by the authorities upon which Skidmore relies. In support of its contention, Skidmore cites *Kahn*, 414 S.W.2d 269, *Evinger v. McDaniel Title Co.*, 726 S.W.2d 468 (Mo.App.1987), *Ribando*, 588 S.W.2d 120, *DeArmon*, 525 S.W.2d 795, *De Long*, 272 S.W.2d 493, and *Gulf, M. & O.R. Co. v. Smith–Brennan Pile Co.*, 223 S.W.2d 100 (Mo.App.1949).[9]

Of the cases cited by Skidmore, only *Kahn* involved a true defective construction action, and even *Kahn* did not specify which method of damages was to be applied as a general rule in defective construction cases. *Kahn*, 414 S.W.2d at 282–83. In that case, the owner of an apartment building sued the general contractor for breach of contract alleging that the contractor failed to construct the building in accordance with the architect's plans, drawings, and specifications. *Id.* at 271–72. The court discussed the different methods for measuring damages which were found in the cases cited by the defendant contractor, but noted the "old but still vital legal maxim" that "in the choice of rules for the measurement of damages in building cases, the old saying that circumstances alter cases has particular force." *Id.* at 282 (citing *Hotchner v. Liebowits*, 341 S.W.2d 319, 332 (Mo.App.1960)).[10] The court in *Kahn* concluded that a jury instruction providing for the measure of damages to be determined using the diminution in value method was appropriate because "the evidence here is sufficient to make a case of substantial, *irreparable* damage, the situation in which the [diminution in value damage] instruction is appropriate." *Kahn*, 414 S.W.2d at 283 (emphasis added).

In the instant case, BMA alleged in Count I of its Second Amended Petition that Skidmore breached its construction contract with BMA and was negligent by defectively performing its contract obligations. The parties stipulated at trial that the cost of removing and replacing the marble was $3,995,592.77. Although Michael Kelly, an appraiser, testified at trial that the diminution in value of the Tower could be measured by the cost of replacing the outer surface of the building, there was no evidence as to the monetary value of the building.[11] Mr. Kelly further testified that the marble panels created a physical hazard to occupants or tenants of the building and the building could not be operated without the repair of the panels.

There was also evidence before the jury that J.E. Dunn made a $1,097,000 dollar estimate for repairing the thin marble cladding by bolting the existing marble into place. The cost figure from Dunn was only a preliminary estimate, because there were no specifications for the repair project. In awarding BMA $3,995,592.77 as the reason-

---

9. Most of these cases are easily distinguishable in that they do not involve defective construction matters: In *Evinger*, purchasers of a tract of land claimed permanent injury to real property because, before they bought the land, the defendant had been negligent in the preparation of their preliminary title report, inducing them to buy the property. Adverse claimants later caused them to suffer from a reformation in title. *Evinger*, 726 S.W.2d at 470; In *DeArmon*, the plaintiff brought suit against a wrecking contractor for damage which occurred to his property during the demolition of an adjacent building. *DeArmon*, 525 S.W.2d at 798; In *De Long*, the owners of an apartment house sued the heating company that installed a gas burner under a contract with the owners in the steam boiler of the owners' apartment house. *De Long*, 272 S.W.2d at 494; And in *Gulf*, the plaintiff sued for damages arising when a truck crossed its bridge carrying a crane, which struck and damaged the support girders and pedestrian walkway. *Gulf*, 223 S.W.2d at 101–02.

In *Ribando*, the plaintiffs did complain of defects arising in the construction of their home,

but, because the damage arose during the erection of a new residence, they claimed breach of an implied warranty or condition of good workmanship, requiring a different test for damages than with general defective construction cases. *Ribando*, 588 S.W.2d at 123–24.

10. *See also, Hammond v. Beeson*, 112 Mo. 190, 197, 20 S.W. 474, 476 (1892) (holding that in ascertaining damages, "[e]ach case must, in a great measure, be determined ... upon the particular facts by which it is attended").

11. BMA presented evidence that it was damaged in the amount of $3,995,592.77 under either measure of damage, cost of repair or diminution in value. Under the defective construction general rule that cost of repair is the measure of damage unless the contractor proves that the cost of reconstruction and completion of the contract results in unreasonable economic waste, BMA made a submissible case under either measure of damages.

able cost of repair, the jury inherently found that BMA was reasonable in removing the marble rather than repairing it by an alternative method.

There was no evidence that the cost of repair constituted unreasonable waste.[12] In view of the record in this case, Skidmore did not meet its burden of proving that removing and replacing the marble constituted unreasonable economic waste. Therefore, the cost of repair method is the appropriate measure of damages in this case and the trial court correctly submitted damage instructions based on the cost of repair. Point D is denied.

In Point E, Skidmore claims that the trial court erred in submitting Instructions 8, 11 and 14, regarding BMA's damages on its claims of negligence, negligence per se and breach of contract respectively, because they improperly permitted the jury to award prejudgment interest. Skidmore argues that BMA was not entitled to prejudgment interest on its breach of contract claim or its negligence claims.

■■■ BMA makes no claim that it is entitled to prejudgment interest, nor do we find grounds for awarding prejudgment interest. BMA argues instead on appeal that it was awarded damages for the "loss of use" of its money which it contends is distinguishable from prejudgment interest. BMA's contention that the judgment was for loss of use of money is supported by both the jury instructions and the trial court's judgment entry. Instructions 8, 11 and 14 directed the jurors, upon a finding for BMA, to award damages in an amount which would "fairly and justly compensate [BMA] for the loss of use of its money expended for the reasonably necessary repair of damage to the BMA Tower." The three verdict forms required the jury to designate separately the damages for cost of repair and loss of use of money. The trial court accepted the jury verdicts and awarded BMA judgment in the amount found by the jury, reduced by the amount received in a settlement agreement and a corresponding

reduction in the damages for loss of use of money.

■■■ To support its argument that it is entitled to the award of damages for loss of use of money, BMA cites in its brief on appeal *Killian Const. Co. v. Tri–City Const. Co.*, 693 S.W.2d 819 (Mo.App.1985); *Groppel Co., Inc. v. U.S. Gypsum Co.*, 616 S.W.2d 49 (Mo.App.1981); and *Havens Steel Co. v. Randolph Engineering Co.*, 813 F.2d 186 (8th Cir.1987). BMA cites the additional cases of *Hoelscher v. Schenewerk*, 804 S.W.2d 828, 833 (Mo.App.1991), and *Cal–Val Const. Co., Inc. v. Mazur*, 636 S.W.2d 391 (Mo.App. 1982), in its motion for rehearing. The cited cases which were decided by Missouri state courts are factually distinguishable from the case at bar in that each involves an instance where a breach of contract forced the expenditure of funds for the payment of interest. In both *Killian*, 693 S.W.2d at 828–29, and *Groppel*, 616 S.W.2d at 64, a breach of contract compelled a subcontractor to borrow money to complete construction in fulfillment of the subcontractor's own contractual obligations; the interest on such borrowed money was allowed as actual damages. *Hoelscher*, 804 S.W.2d at 833, authorized the recovery of interest the seller had to pay on the seller's mortgage after a purchaser failed to fulfill the parties' contract to purchase a house. The *Cal–Val Const.* court, in a suit for specific performance of a contract for construction and sale of a home, affirmed the award of damages for increased interest rates the purchaser was obligated to pay as a result of a lost loan commitment. *Cal–Val Const.*, 636 S.W.2d at 392–93.

BMA's claim for loss of use of money is distinguishable from the claims asserted in *Killian, Groppel, Hoelscher* and *Cal–Val Const.*, because BMA did not actually expend any money to pay the interest BMA claims as damages. *Havens*, however, does not require an actual expenditure to qualify for loss of use damages. The federal district court in *Havens* found that the evidence was "less developed than it might have been" in show-

---

12. During the trial, Skidmore referred to a one million dollar *estimate* from J.E. Dunn & Co. for securing the marble cladding by the installation of bolts through the marble into the cement structure of the building. The cost figure from Dunn was only a preliminary estimate, because there were no specifications for the repair project.

ing that the subcontractor had actually borrowed all of the money it was required to spend to complete the construction. *Havens Steel Co. v. Randolph Engineering Co.*, 613 F.Supp. 514, 541 (W.D.Mo.1985). The court, however, awarded damages for loss of use of money based on the rationale of a Maryland case, *Md. Port Admin. v. C.J. Langenfelder, etc.*, 50 Md.App. 525, 438 A.2d 1374, 1381–85 (1982), which suggested that it was irrelevant whether the subcontractor borrowed the money or used its own capital. *Havens*, 613 F.Supp. at 541. In affirming the district court, the Eighth Circuit Court of Appeals opined that a Missouri court would apply the reasoning articulated in the Maryland case. *Havens*, 813 F.2d at 188. This court, however, is not inclined to expand the Missouri decisions to award damages for loss of use of money in cases where no expenditure was actually made by the claimant. To so allow would, in effect, permit claimants such as BMA to circumvent the law on prejudgment interest by obtaining interest damages without meeting the criteria for prejudgment interest or in amounts in excess of that authorized by law for prejudgment interest.

BMA's only evidence to support the trial court's award to BMA of $1,692,399.10 was a stipulated calculation in BMA's Exhibit 93. Such calculation determined "the amount BMA would have earned on the money spent to remove and replace the marble facade."[13] There is no evidence, or even a claim by BMA, that it was actually required to expend money for interest payments as a result of Skidmore's breach of contract. Therefore, the trial court erred in awarding BMA damages for loss of use of money. That portion of the judgment allowing BMA such damages is reversed. Point E is granted.

Skidmore argues in Point F that the trial court erred in submitting negligence and negligence per se to the jury. Skidmore asserts that BMA cannot recover in tort for the purely economic loss claimed in its negligence theories since no evidence of personal injury or damage to other property was presented. Skidmore contends that under Mis-

souri law liability for "economic loss" is contractual rather than in tort. The analysis of Point F is limited to BMA's general negligence claim since BMA's negligence per se claim is disallowed in Point G.

In Missouri, a mere breach of contract does not provide a basis for tort liability, but the negligent act or omission which breaches the contract may serve as the basis for an action in tort. *American Mortg. Inv. Co. v. Hardin–Stockton*, 671 S.W.2d 283, 293 (Mo.App.1984). If the duty arises solely from the contract, the action is contractual. *Id.* The action may be in tort, however, if the party sues for breach of a duty recognized by the law as arising from the relationship or status the parties have created by their agreement. *Id.* For example, this court stated in *Hardin–Stockton* that the "failure of a real estate broker to perform his contractual and fiduciary duties supports an action either for breach of contract or for negligence." *Id.* at 290.

When a person possesses knowledge or skill superior to that of an ordinary person, the law requires of that person conduct consistent with such knowledge or skill. W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 32, at 185 (5th ed. 1984). A professional person owes a client a duty of care commensurate with "the degree of care, skill and proficiency commonly exercised by ordinarily skillful, careful and prudent professionals." *Murphy v. A.A. Mathews*, 841 S.W.2d 671, 674 (Mo. banc 1992). An architect, as a member of a learned and skilled profession, has a duty to exercise the ordinary and reasonable technical skill that is usually exercised by one in that profession. *Chubb Group of Ins. v. C.F. Murphy & Assoc.*, 656 S.W.2d 766, 774 (Mo.App.1983); *Rowe v. Moss*, 656 S.W.2d 318, 321 (Mo.App. 1983). Injury resulting from an architect's failure to use due care subjects the architect to liability for that injury. *Chubb Group*, 656 S.W.2d at 774.

13. A review of Exhibit 93 reveals that BMA's calculation of damages for loss of use of money in Exhibit 93 was based on a compounding of interest. The cases relied upon by BMA for loss of use of money damages are not authority for the compounding of interest in computing such damages.

Skidmore contends that Missouri law limits recovery in tort for purely economic damage to those cases involving personal injury, damages to property other than that sold, or destruction of the property sold due to a violent occurrence. *Clark v. Landelco, Inc.*, 657 S.W.2d 634, 636 (Mo.App.1983). In actions involving architects, Missouri courts have not addressed the question of whether a negligence claim may be maintained for purely economic damages. Although not binding precedent, this court finds persuasive two federal court decisions which have directly addressed this question. In *Bryant v. Murray–Jones–Murray, Inc.*, 653 F.Supp. 1015 (E.D.Mo.1985), the court considered a claim that an architect was negligent for failing to use ordinary care in drawing up plans and supervising construction. The architect argued that Missouri law prohibited recovery for economic loss under a negligence cause of action except in cases involving personal injury or damage to property other than the property at issue. *Id.* at 1015. The court found such rule inapplicable to the "negligent rendition of services by a professional," *id.*, and cited *Aetna Ins. Co. v. Hellmuth, Obata & Kassabaum, Inc.*, 392 F.2d 472 (8th Cir.1968), in doing so. *Aetna* allowed a third-party surety of a construction company to recover on a negligence theory for economic loss resulting from an architect's failure to supervise construction. *Id.* at 478. In both *Bryant* and *Aetna*, the federal courts were applying Missouri law.

Skidmore cites *Crowder v. Vandendeale*, 564 S.W.2d 879, 882 (Mo. banc 1978),[14] and *Clark*, 657 S.W.2d at 636, as Missouri authority in support of its argument that BMA cannot recover for economic loss on a theory of negligence. Both *Crowder* and *Clark* involve actions by homeowners against the builder for defects in the quality of the residence. The courts in both cases found that the owners had only a contractual claim under the theory of implied warranty of habitability, rather than a remedy in tort, because the builder had no duty other than its contractual obligations to protect the owners

from deterioration or loss of bargain damages. *Crowder*, 564 S.W.2d at 884; *Clark*, 657 S.W.2d at 635. The nature of the claims and the factual situations in *Crowder* and *Clark* make them distinguishable from the case at hand. Unlike the instant case, *Crowder* and *Clark* do not involve claims arising from a professional's common law duty of care.

The rule asserted by Skidmore, that recovery for economic loss in tort is prohibited except in certain situations, has also been applied in the context of actions against manufacturers of defective products. These cases are distinguishable from the instant case because they either do not involve a professional's common law duty of care or they involve claims asserted under the theory of strict liability in tort. *See Clevenger & Wright Co. v. A.O. Smith, etc.*, 625 S.W.2d 906 (Mo.App.1981); *Forrest v. Chrysler Corp.*, 632 S.W.2d 29 (Mo.App.1982); *Gibson v. Reliable Chevrolet, Inc.*, 608 S.W.2d 471 (Mo.App.1980).

In the instant case, BMA contracted with Skidmore for the rendition of architectural services. In addition to the contractual duties arising from the contract between BMA and Skidmore, Skidmore had a duty to provide professional architectural services in a manner consistent with the skill and competence of other members of its profession. Skidmore owed a duty to BMA to exercise ordinary and reasonable skill in designing the BMA building and supervising its construction. BMA's general negligence claim is based upon Skidmore's common law duty to provide architectural services in a professional manner, and the trial court did not err in allowing BMA to assert such a claim. Point F is denied.

In Point G, Skidmore asserts that the trial court erred in submitting BMA's claim for negligence per se, because BMA failed to state such a claim in that there was no evidence that Skidmore violated any statute, rule or regulation which is an essential ele-

---

14. In *Sharp Bros. v. American Hoist & Derrick Co.*, 703 S.W.2d 901, 903 (Mo. banc 1986), the Missouri Supreme Court denied recovery in a products liability case on a theory of strict liability in tort where the only damage was to the product sold. In doing so, the court overruled dictum in *Crowder* indicating otherwise.

ment of such a claim. Skidmore also argues that Instruction 10 contained duties and obligations not present in any statute, rule or regulation so that, even if breached, they would not state a claim for negligence per se.

Skidmore asserts in its brief that BMA failed to plead a claim for negligence per se in any of its petitions filed in this case and, thus, the trial court should not have submitted such a claim to the jury. Examination of BMA's second amended petition leads this court to the conclusion that Skidmore is correct in its contention that BMA did not plead a claim for negligence per se. Skidmore did not, however, at any time before the case was submitted to the jury, object on the ground that such a claim should not be submitted to the jury because BMA had not pled negligence per se.

BMA's evidence supported the other causes of action it pled and, therefore, it is possible that Skidmore did not have notice, until BMA proffered its instruction, that BMA intended to seek recovery under a theory of negligence per se. During the instruction conference, Skidmore's counsel was on notice that BMA intended to submit a claim for negligence per se and had the opportunity to object on the ground that such a cause of action had not been pled by BMA. Counsel for Skidmore did not do so. Skidmore objected to the proffered negligence per se instructions on the ground that negligence per se was "not an appropriate basis for a cause of action." In its motion for new trial, Skidmore argued for the first time that the trial court erred in failing to direct a verdict in its favor because BMA did not plead negligence per se.

■■■■ Although Skidmore is correct in its contention that BMA did not plead negligence per se, it has waived such error by failing to object to the submission of negligence per se to the jury. A party may not utilize a motion for new trial to raise an objection that should have been raised during trial. *Colley v. Tipton,* 657 S.W.2d 268, 273 (Mo.App.1983). Failure to object in a timely manner at trial may be deemed to be a waiver or abandonment of the objection. *McMillin v. Union Elec. Co.,* 820 S.W.2d 352, 355 (Mo.App.1991). Because BMA's pleading error is not dispositive of this point, this court must now consider whether BMA established a submissible claim against Skidmore for negligence per se.

■■■■ The following four requirements must be met to establish a claim for negligence per se: 1) a violation of a statute or ordinance; 2) the injured party must be within the class of persons intended to be protected by the statute or ordinance; 3) the injury complained of must be of the nature that the statute or ordinance was designed to prevent; and 4) the violation of the statute or ordinance must be the proximate cause of the injury. *Gipson v. Slagle,* 820 S.W.2d 595, 597 (Mo.App.1991). BMA's evidence at trial did not specify, nor did the trial court's instruction on negligence per se specify, the statute that it claimed Skidmore violated to fulfill the first element of negligence per se. In deciding this case, this court assumes that BMA was relying on § 327.411 because the language of the instruction discusses the placement of the architect's professional seal on architectural drawings, which is the subject matter of § 327.411. Chapter 327 regulates architects, professional engineers and land surveyors. Section 327.411.2 reads as follows:

The personal seal of a registered architect or professional engineer or land surveyor shall be the legal equivalent of his signature whenever and wherever used, and the owner of the seal shall be responsible for the whole architectural or engineering project or for the entire survey, as the case may be, when he places his personal seal on any plans, specifications, estimates, plats, reports, surveys or other documents or instruments for or to be used in connection with any architectural or engineering project or survey, unless he shall attach a statement over his signature, authenticated by his personal seal, specifying the particular plans, specifications, plats, reports, surveys or other documents or instruments intended to be authenticated by the seal, and disclaiming any responsibility for all other plans, specifications, estimates, reports, or other documents or instruments relating to or intended to be used for any

part or parts of the architectural or engineering project or survey.

Chapter 327 is a licensing statute. BMA cites no cases in which a professional licensing statute forms the basis for a negligence per se action. The overall purpose of Chapter 327 is the protection of members of the public who contract for the service of an architect, engineer or surveyor. *Gipson,* 820 S.W.2d at 597. Chapter 327 has its own disciplinary provisions for enforcing that purpose which include censure and license revocation. In *Hardin–Stockton,* 671 S.W.2d at 294, this court considered and rejected a negligence per se claim, based upon a licensing statute for real estate brokers, which is analogous to the claim made by BMA. This court determined that the licensing statute did not present a basis upon which a claim for negligence per se could be maintained. *Id.* at 295.

The nature of Chapter 327 indicates that § 327.411 was not designed to provide a cause of action for negligence per se but, instead, to insure that the professional persons it regulates display and maintain a certain standard of competence within their profession. The trial court erred in submitting a cause of action for negligence per se to the jury on the basis of Skidmore's alleged violation of § 327.411. BMA did not prove the third requirement of negligence per se, which is that the injury complained of must be of the nature that the statute is designed to prevent. Point G is granted. Because BMA submitted three alternative theories upon which it claimed entitlement to damages from Skidmore for its required repair of the marble panels, a finding by this court that it was not entitled to submit one of the three theories does not entitle Skidmore to relief from the judgment for cost of repair, since the jury found identical damages on each theory of recovery. *See Magnuson by Mabe v. Kelsey–Hayes Co.,* 844 S.W.2d 448, 456 (Mo.App.1992).

Having addressed and decided the points raised by Skidmore, the final matter for consideration by this court is the claim presented by BMA in its cross-appeal. In its sole point relied on, BMA asserts that the trial court erred in refusing to submit BMA's punitive damage claim because Skidmore displayed a conscious disregard for the safety of others. BMA contends that such conscious disregard was manifested by the fact that a Skidmore architect applied his professional seal to drawings and approved shop drawings prepared by others without determining the safety of the design or whether it complied with the Kansas City Building Code. Skidmore raises procedural issues concerning BMA's cross-appeal which are dispositive.

▮ Skidmore first asserts that the punitive damages issue has not been preserved for review because the legal file does not contain BMA's instruction on punitive damages which was refused by the trial court. Rule 84.04(e) requires that if a point relied on pertains to the refusal of an instruction, such instruction should be set forth in its entirety in the argument portion of the brief. Failure to do so will result in the issue not being properly before the court for review. *Henges Assoc. v. Indus. Foam Products,* 787 S.W.2d 898, 901 (Mo.App.1990). BMA set forth its refused punitive damages instruction in its brief and has, therefore, properly placed this issue before this court for review.

▮ Skidmore also argues that the issue of punitive damages was not properly preserved because BMA did not object at the instruction conference to the trial court's refusal of the instruction. Rule 70.03 states that specific objections to instructions need not be made prior to the motion for new trial. The validity of this rule had been called into question by several cases suggesting that specific objections to instructions at trial were necessary to preserve the issue for review. *See Hudson v. Carr,* 668 S.W.2d 68 (Mo. banc 1984); *Fowler v. Park Corp.,* 673 S.W.2d 749 (Mo. banc 1984). More recently, however, the case law evidences a shift back to the principles espoused in Rule 70.03. *See Goff v. St. Luke's Hosp. of Kansas City,* 753 S.W.2d 557 (Mo. banc 1988); *Powers v. Ellfeldt,* 768 S.W.2d 142 (Mo.App.1989). Lack of an objection at trial on an issue of alleged instructional error will not prevent review if the alleged error is otherwise preserved, however, reversal on appeal will not be warranted unless prejudice is established. *Goff,* 753 S.W.2d at 565; *Powers,* 768 S.W.2d at 147. BMA's failure to object to the trial court's refusal to give its punitive damages

instruction does not prevent appellate review since the alleged error has been otherwise properly preserved.[15]

Skidmore further contends that if this court finds the punitive damages issue has been properly preserved for review, the only claim on which it has been preserved for review is negligence per se. Skidmore argues that the instruction set forth in BMA's brief improperly departs from MAI 10.07 because it fails to refer to a specific verdict-directing instruction. Skidmore asserts that because the language in paragraph "First" is almost identical to BMA's negligence per se verdict director, that is the only claim upon which BMA has preserved review.

 The record does not support that BMA submitted its punitive damages instruction on any claim other than negligence per se. The punitive damage instruction at issue does not indicate which verdict-directing instruction BMA's punitive damages instruction referenced. After the jury returned its verdicts, the court held a conference with counsel on the statute of limitations and punitive damages issues. The court ruled that it would not submit punitive damages to the jury. Counsel for BMA objected and stated that this "is a case for punitive damages, particularly on a finding of negligence per se." Counsel's objection to the court's ruling on the punitive damages instruction and the language of the instruction itself support a finding that the only claim upon which BMA has preserved the punitive damages issue for review is its negligence per se claim. In addition, the arguments in BMA's brief only address its negligence per se claim.

Due to the disposition of Point G, in which this court found that the trial court erred in submitting to the jury a cause of action for negligence per se, this court finds BMA's contentions in its cross-appeal to be without merit. Inherent in the finding that BMA was not entitled to submission of its negligence per se claim, is the finding that BMA was not entitled to an instruction on punitive damages on such claim. The cross-appeal is denied.

The judgment is reversed insomuch as it denies Skidmore the affirmative defense of statute of limitations and awards BMA damages for loss of use of money. In the interest of judicial economy, the cause is remanded for retrial on the issue of statute of limitations only, since it is a well-established rule that a new trial may be limited to fewer issues than those originally tried in the case, so long as "one or more of the issues [was] properly considered and determined, and that a new trial limited to the remaining issues will not result in prejudice or injustice to a party." *Artstein v. Pallo*, 388 S.W.2d 877, 882 (Mo. banc 1965); *see also Sunny Baer Co. v. Slaten*, 623 S.W.2d 595, 599 (Mo. App.1981); *Moss v. Greyhound Lines, Inc.*, 607 S.W.2d 192, 196 (Mo.App.1980). The remaining provisions of the judgment are held in abeyance, pending the remand for a new trial, wherein the court is directed to address only the affirmative defense of statute of limitations.

All concur.

15. This court notes that Rule 70.03 has been revised with the proposed revisions to take effect on January 1, 1994. Contrary to the present language of Rule 70.03 and to the recent shift in the case law, the new Rule 70.03 requires that, in order to preserve error for appeal, objections to instructions must be made prior to submission.